*In re* MARY ANN PROUGH *et al.*, —(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* JOHN PROUGH *et al.*, Respondents-Appellants.)

Fourth District No. 14600

Opinion filed June 2, 1978.

Frank Davis, of Urbana, for appellants.

Thomas J. Difanis, State's Attorney, of Urbana (James E. Souk, Assistant State's Attorney, and John Rabiej, law student, of counsel), for the People.

Mr. JUSTICE REARDON delivered the opinion of the court:

The respondents, John and Nancy Prough, are the natural parents of four minor children, Mary Ann, Johnny, Clifford, and Tammy, who are now between the ages of 8 and almost 2. The respondents appeal an order of the circuit court filed July 22, 1977, which recited that the court found the children to be neglected and dependent and that the respondents· were unfit or unable to care for the children. The order adjudged the children wards of the court, terminated the respondents' parental rights, and appointed the guardianship administrator of the Department of Children and Family Services (hereinafter referred to as the Department) as the guardian of the minors with specific authority to consent to their adoption.

On March 10 and 22, 1977, Carol W. Acord, a child welfare worker for the Department filed the petitions which instituted this action. At a hearing on the petitions on June 8, 1977, much testimony was received concerning the home environment of the children.

Michael Denneman, an Urbana police officer, had been called to the Prough residence and entered the home to investigate a disturbance call on September 12, 1976. Denneman described the residence as "utter filth," noting broken furniture, moldy, rotting food stuffs on the floor, and an abundance of trash. He saw two children, one male and one female, sitting in the living room partially dressed and dirty. He entered the kitchen and saw trash, bugs on an old fly strip, and a stove covered with dry, dirty, and burned food stuffs. He went upstairs and noticed the odor of baby diapers. He entered another room and and saw an infant covered with red, open sores on its feet, chest, and legs. Officer Denneman stated that in his five years with the Urbana Police Department he had viewed many situations of suspected child neglect and that he felt the environment at the Prough home was the worst he had ever seen.

Kathleen Pecknell testified that she was employed with the Metro Police Social Service and accompanied Officer Denneman to the Prough residence on September 13, 1976. She stated that the kitchen was littered with debris and that she detected a strong stench of garbage. She went upstairs and saw a young boy who had defecated on the bed and observed that the child had open sores on his arms, legs, and on his front. Mrs. Pecknell also indicated that the environment of the Prough home on September 13 was the worst she had ever encountered in suspected child neglect situations.

Donna James testified that she was employed by the Champaign County Housing Authority which is responsible for the Prough residence, a unit of public housing. Sometime during a one or two-week period prior to January 18, 1977, Mrs. Prough visited Mrs. James at her office. Although the outside temperature was only about "5° above" with a strong

wind, Mrs. Prough carried a baby who was approximately 8 months old. The child was attired in a T-shirt and diaper.

Carol Acord testified that she had been a child welfare worker for the Department for 6½ years and had first become involved with the Prough family on September 13, 1976, after receiving a report from Kathleen Pecknell. She testified that the Department had been involved with the Proughs from September 24, 1970, until January 1976, and, for more than 8 months, had furnished three homemakers to the Proughs in addition to numerous other assistance services. The placement of homemakers in the home is the most intensive type of assistance which the Department is able to furnish to a family encountering problems in child care and home management. Mrs. Acord visited the Prough home on September 15, 1976, and observed that the home was in a condition very similar to that described by Denneman and Mrs. Pecknell. She saw Tammy Prough in her crib and described her as being very dirty and in wet clothing. Tammy had a reddish area in the genital area, dried feces on her body, and a rash on her face and buttocks. According to Mrs. Acord, Mr. Prough tried to change Tammy's clothes and feed her, but he needed help and advice from Mrs. Acord to complete the tasks. The Proughs also refused the Department's offer to place a homemaker in the home in September 1976. Mrs. Acord stated that she made follow-up visits to the Prough home once or twice a week after September 1976. On November 3, 1976, she observed Clifford with a severe rash in his genital area so she took Clifford to an emergency room for treatment.

Tammy was hospitalized in January 1977 for pneumonia and, at the end of that month, Mrs. Acord "lost contact" with the respondents. Contact was reinstated on March 9, 1977, at which time Mrs. Acord discovered that the respondents had moved to the home of Mrs. Prough's mother. Mrs. Acord observed that that home was filthy, that Johnny was dirty and had a severe scab on his buttocks, that Mary Ann was dirty and that Tammy was thin and pale looking. Mrs. Acord testified that she also learned that Clifford had been hospitalized on March 7, 1977, for an overdose of drugs which he had discovered at his grandmother's home. Mrs. Acord added that Tammy was the most undernourished child she had seen in her 6½ years as a social worker. During Mrs. Acord's association with the Proughs, Tammy was hospitalized for approximately 1 to 2 weeks because she experienced feeding difficulties. In her testimony, Mrs. Acord concluded that the respondents were unable to improve their parental skills in order to properly care for the children.

Testimony concerning the educational difficulties of the children which resulted from their impoverished environment was received from Edward Cieniawaski, Linn Hatfield, and Lorna Green. Cieniawaski is the principal of Washington School in Urbana and he testified that Mary Ann

was enrolled in that school during the 1975-76 school year from January 29, 1976, to the end of the year and during the 1976-77 school year from the beginning of the school year to February 1, 1977. The attendance for the 1975-76 period showed that Mary Ann was enrolled 85 days and absent 25 days. In the 1976-77 period, she was enrolled 91 days, absent 35 days, and tardy twice. Through this period, Mary Ann was 7 years old. Linn Hatfield testified that she is a kindergarten teacher at the Dr. Howard School in Champaign and that Mary Ann was enrolled in her class from March 21 to June 6, 1977, after Mary Ann had been placed in a foster home. Ms. Hatfield testified that Mary Ann had only missed 1 out of 52 class days during this period and had markedly improved her classroom behavior.

Lorna Green testified that she is a teacher at Marquette School in Champaign in the level one program for the trainable mentally handicapped. Ms. Green testified that one of her students, Johnny Prough, had been absent from class on 53 out of 103 school days prior to his placement in a foster home. She stated that Johnny was often dirty, had an odor about his person, was jumpy, nervous, and produced a very low quality academic work product. Following his placement in a foster home, Johnny was reenrolled in Ms. Green's class on March 29, 1977. After his reenrollment, he missed only 2 of 49 school days, his personal appearance improved and his classwork improvement was, in the words of his teacher, "remarkable." With continued improvement in attendance and rate of progress, Ms. Green felt Johnny could advance to the program for the educable mentally retarded. She also indicated that such an advancement would probably mean that Johnny would be able in later life to hold a job, get married, raise a family, and lead a reasonably normal life. Without such an improvement, Johnny's prognosis would probably not include such achievements.

Other testimony was received from Drs. Ronald Deering, Daniel Pugh, and Theodore A. Kiersch. Dr. Deering testified that he is a pediatric specialist who treated Tammy in January 1977, for bacterial pneumonia when she was approximately 6 months old. He stated that the illness could have been caused by exposure to extremely cold weather, although he was unable to determine that the pneumonia was the result of anyone's neglect. Dr. Pugh testified that he was a psychiatrist and had examined both of the respondents. He diagnosed John Prough as being mentally retarded and Nancy Prough as being in the "borderline range" of mental retardation. Dr. Kiersch testified that the type of intelligence problems he diagnosed in the respondents were sufficient to render them unable to care for or even to learn how to care for their children.

Before the hearing was concluded, the respondents testified as to the

love they felt for the children and their desires to have the children reside with them. Both promised to provide a good life for the children and that they would see to it that the children receive good educations.

At the conclusion of the hearing, the court found that the children were neglected and dependent. The court noted its sympathy for the condition, plight, and feelings of the respondents and also noted that they themselves are victims of the environment in which they live. The court then adjudged the children wards of the court, terminated the respondents' parental rights, and appointed the guardianship administrator of the Department as the children's guardian with specific authority to consent to their adoption.

On appeal, the respondents contend: (1) that the court erred in combining the adjudicatory and dispositional proceedings into a single hearing; (2) that the court abused its discretion by permitting the psychiatrists to testify at the combined hearing; (3) that the State failed to prove by a preponderance of the evidence that the children were neglected or dependent; (4) that the State failed to present clear and convincing evidence of the respondents' unfitness; and (5) that the interests of the children were not adequately protected by appointed counsel.

In the instant case, after informing the respondents that the issues it was going to decide concerned only the neglect and dependency issues raised by the petitions, the court went ahead and heard evidence on all of the issues raised by the petitions. As a result, the court held a single, unified proceeding on adjudicatory and dispositional matters. Counsel for the respondents did not object to this procedure.

■■ It is our belief that sections 4—6, 4—8, and 5—1 of the Juvenile Court Act (Ill. Rev. Stat. 1975, ch. 37, pars. 704—6, 704—8, 705—1) generally contemplate the holding of separate adjudicatory and dispositional hearings. Although we believe the better practice to be the use of such bifurcated proceedings, we also note that their consolidation may be proper where there is no resulting prejudice. *People v. Brady* (1972), 7 Ill. App. 3d 404, 407-08, 287 N.E.2d 537; *People ex rel. Jones v. Jones* (1976), 39 Ill. App. 3d 821, 827, 350 N.E.2d 826.

■■ In *Brady,* we noted that section 5—1 of the Juvenile Court Act (Ill. Rev. Stat. 1975, ch. 37, par. 705—1) provides for the admission of all probative evidence on the question of disposition, even though that evidence may not be competent for the purposes of the adjudicatory hearing. In the instant case, respondents contend that the testimony of Drs. Pugh and Kiersch was dispositional in nature and should not have been heard at the combined hearing. There was, however, no objection to this testimony at the hearing. We find, therefore, that this alleged error, like that alleged in the first issue, has been waived by the respondents.

(*People v. Spenard* (1977), 46 Ill. App. 3d 892, 897-98, 361 N.E.2d 856.) In making this determination, we are aware of the presumption that a court sitting without a jury has relied only on competent evidence in making its determination. (*In re Love* (1977), 50 Ill. App. 3d 1018, 1025, 366 N.E.2d 139.) Here, this presumption has not been rebutted by a clear showing to the contrary.

■■ The proper standard of proof applicable in an adjudication of neglect or dependency is proof by a preponderance of the evidence, not proof beyond a reasonable doubt. (*In re Gonzales* (1974), 25 Ill. App. 3d 136, 143, 323 N.E.2d 42.) In the instant case, this standard was obviously met by the overwhelming testimony concerning the deplorable condition of the respondents' home and the heartbreaking testimony concerning the appearance, health, and educational achievements of the respondents' children.

■■ Parental unfitness must be established by proof of a clear and convincing nature. (*In re Vienup* (1976), 37 Ill. App. 3d 217, 222, 345 N.E.2d 742.) This standard is a tacit recognition that parents have an inherent right to the society and custody of their children which should not be abrogated except for the most compelling of reasons. In this case, there was abundant testimony concerning the respondents' unfitness to retain custody of their children. The Department engaged in a lengthy and unsuccessful attempt to assist the respondents with the most intensive help it had at its disposal. Ms. Acord testified that she had been rebuked by the respondents on several occasions when she offered her help. Furthermore, two psychiatrists testified that the respondents lacked the intellectual development necessary to enable them to care for or learn how to care for their children. Accordingly, we find that the evidence of parental unfitness in this case is indeed of a clear and convincing nature.

■■ The respondents allege that counsel for the children in this case was appointed on the day of the hearing, that counsel lacked an adequate period of time in which to prepare the case and that, therefore, the children were not afforded the effective assistance of counsel. In order to warrant a reversal for reasons of incompetency of counsel, the defendant must establish that appointed counsel was actually incompetent and that substantial prejudice resulted from that inferior representation. (*In re Williams* (1975), 30 Ill. App. 3d 1025, 1028-29, 333 N.E.2d 674.)

In the instant case, although counsel was appointed on the day of the hearing and played essentially a passive role in the proceeding, we do not see how the children were substantially prejudiced by that representation. In fact, our review of the record causes us to conclude that the role played by the children's counsel was typical of most attorneys who represent the interests of other children in similar proceedings.

For the forgoing reasons, we affirm the order adjudging respondents'

children wards of the court, terminating the respondents' parental rights and appointing the guardianship administrator of the Department as the guardian of the children with authority to consent to their adoption.

Affirmed.

GREEN, P. J., and TRAPP, J., concur.