In re D.L., JR., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. D.L., Sr., Respondent-Appellant).

First District (4th Division)   No. 1—87—1491

Opinion filed February 20, 1992.—Rehearing denied March 23, 1992.

M. Jacqueline Walther, of Kielian & Walther, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Mary Brigid Kenney, and Donald T. Layman, Assistant State's Attorneys, of counsel), for the People.

Ryan, Miller & Trafelet, of Chicago (Mary Ellen Dienes, of counsel), for other appellees.

Patrick Murphy, Public Guardian, of Chicago, guardian *ad litem*.

JUSTICE LINN delivered the opinion of the court:

The Illinois Department of Children and Family Services petitioned the circuit court of Cook County for an adjudication of wardship of D.L. At the conclusion of separate adjudicatory and dispositional hearings, the trial court found that D.L. was a dependent

minor; adjudged him to be a ward of the court; and awarded custody of D.L. to his maternal great-uncle and great-aunt, James and Judy Taylor, and appointed them D.L.'s guardians.

D.L.'s father, D.L., Sr., appeals. He contends the trial court erred by: (1) holding a temporary custody hearing without the presence of his counsel; and (2) ruling that the Taylors were necessary parties to the proceedings. D.L., Sr., contends the trial court also erred at the dispositional hearing by: (3) denying his motion to exclude witnesses; and (4) admitting into evidence improper opinion testimony.

We affirm the order of the trial court.

BACKGROUND

A

The record contains the following pertinent facts. D.L.'s father, D.L., Sr., and D.L.'s mother, J.L., were married in 1982. J.L.'s family included two sisters (D.L.'s maternal aunts), Kathy Downs and Diane DeTratto, and an uncle and aunt (D.L.'s great-uncle and great-aunt), James and Judy Taylor.

D.L. was born in 1984. It is undisputed that the marriage of D.L.'s parents soured at least by the time D.L. was born. From February to September 1985, D.L.'s parents were separated. During that time, D.L. and his mother lived with the Taylors. Also, in August 1985, D.L., Sr., absconded with D.L. to Florida. He returned with the infant to Chicago when he and J.L. agreed to attempt a reconciliation.

In February 1986, J.L. separated from D.L., Sr., for the last time, taking D.L. with her. J.L. moved in with her sister, Kathy Downs. On May 21, 1986, J.L. went out alone and never returned. When J.L. failed to return the next day, Kathy entrusted D.L. to the Taylors to watch because she had to go to work. D.L. has been residing with the Taylors since that time.

J.L.'s corpse was found on June 1, 1986. The body was found in a river. The hands were bound. J.L. died of multiple gunshot wounds. D.L., Sr., was charged with killing her and was arrested.

B

On June 3, 1986, the Illinois Department of Children and Family Services (DCFS) filed in the trial court a petition for adjudication of wardship under the old Juvenile Court Act, which has been replaced by the Juvenile Court Act of 1987. (Ill. Rev. Stat. 1985, ch. 37, par. 701—1 et seq., replaced by Ill. Rev. Stat. 1987, ch. 37, par. 801—1 et

*seq.*) The petition alleged that D.L. was neglected, *i.e.*, D.L., Sr., did not provide the care necessary for D.L.'s well-being (see Ill. Rev. Stat. 1985, ch. 37, par. 702—4(1)), and also that D.L. was dependent, *i.e.*, D.L. lacked proper care due to the physical disability of D.L., Sr. (See Ill. Rev. Stat. 1985, ch. 37, par. 702—5(1)(b).) On the same day, the trial court appointed DCFS temporary custodian of D.L. and appointed a guardian *ad litem* for the child. The agency allowed D.L. to remain with the Taylors.

On August 11, 1986, the Taylors petitioned the trial court for temporary custody of D.L. and sought leave to intervene in the proceedings. At this time, three families sought appointment as temporary custodians of D.L.: the family of D.L.'s paternal uncle, Alfredo; the Taylors; and the family of Diane DeTratto.

A hearing on the motion was set for August 27 at 9 a.m. D.L., Sr., and his brother Alfredo were present, but not counsel for D.L., Sr. The trial court held over the case until 11:25 a.m. Counsel for D.L., Sr., had not yet appeared. The trial court denied the request of D.L., Sr., for a continuance and held the hearing.

The trial court heard from the Taylors' counsel, a representative of DCFS, an assistant State's Attorney, and D.L.'s guardian *ad litem*. The DCFS representative opined that the homes of all of the proposed temporary custodians were suitable. The other attorneys agreed that D.L. should remain with the Taylors. The court gave D.L., Sr., and Alfredo an opportunity to be heard. At the close of the hearing, the trial court appointed the Taylors temporary custodians of D.L. The court further found that the Taylors' appointment as D.L.'s temporary custodians rendered their petition to intervene in the proceedings moot. The court reasoned that "temporary custodians are parties to these proceedings."

The trial court held the adjudicatory hearing on November 26, 1986. (See Ill. Rev. Stat. 1985, ch. 37, par. 704—1 *et seq.*) After the court advised D.L., Sr., of his rights and with the assistance of his counsel, D.L., Sr., admitted that D.L. was a dependent child. To provide a factual basis for the admission, the State proffered the testimony of D.L.'s DCFS caseworker. She would testify that D.L., Sr., was incarcerated in Cook County jail and, consequently, unable to provide the necessary care to D.L. The trial court accepted the admission of D.L., Sr., and found that D.L. was a dependent minor, based on the physical disability of D.L., Sr.

The dispositional hearing began on February 10, 1987. (See Ill. Rev. Stat. 1985, ch. 37, par. 705—1 *et seq.*) The State, the Taylors, Alfredo, and D.L., Sr., each called witnesses. The State called Christine

McGrath, a DCFS supervisor. McGrath reviewed the case in September 1986, prior to assigning it to DCFS caseworker Joan Brown. McGrath reviewed the case with Brown every two to three weeks. Approximately one week prior to the hearing, McGrath assumed personal responsibility for the case because Brown went on medical leave. McGrath reviewed the file for the hearing, personally visited the homes of the Taylors and Alfredo, and prepared a supplemental report.

McGrath stated that D.L. received treatment from Colin Weber, a social worker at the Institute of Psychoanalysis trained in child psychotherapy. The counseling was believed necessary due to the death of D.L.'s mother and the allegation that his father had killed his mother. Weber opined to McGrath that D.L. had begun to bond to the Taylors and that it would be in D.L.'s best interests if he remained with the Taylors. Also, approximately three weeks prior to the hearing, caseworker Brown opined to McGrath that it would be in D.L.'s best interests if he remained with the Taylors. McGrath agreed with the agency's written reports that all three households could supply D.L.'s needs. However, based on her conversations with Brown and Weber, and her own observations, McGrath also opined that it would be in D.L.'s best interests to remain with the Taylors.

During his cross-examination of McGrath, counsel for D.L., Sr., moved that the witnesses be excluded from the hearing when not testifying. The trial court denied the motion. The court reasoned that since all of the witnesses are interested in D.L., they should hear all of the evidence that pertains to him.

The Taylors called several witnesses at the dispositional hearing. Diane DeTratto testified that she, the Taylors, and D.L. shared a common ethnic heritage through his mother. Also, the Taylors lived in an ethnically integrated neighborhood. Approximately three days subsequent to J.L.'s disappearance, DeTratto and her husband met with her sister Kathy Downs, a brother, and the Taylors. They agreed that the Taylors should be appointed guardians of D.L. The family based its opinion on the fact that D.L. spent most of his life in or near the Taylors' home. D.L. lived with the maternal side of his family for approximately one week in the summer of 1984, from January through September 1985, and from February 1986 through the time of the hearing.

DeTratto observed D.L. when he lived with the Taylors prior to his mother's death. It appeared to DeTratto that the Taylors and their two daughters were affectionate to D.L. and he to them. If the Tay-

lors were not appointed D.L.'s guardians, DeTratto and her husband wanted to be appointed guardians of the child.

Robert Schreck is an attorney and a friend of the Taylors. He met the Taylors through Kathy Downs and had known them for approximately two years. Schreck discussed with the Taylors' neighbors the feasibility of a fundraiser, the proceeds of which to go to the Taylors' expenses in seeking guardianship of D.L. Schreck stated: "The neighbors basically were outraged that a confessed murderer was trying to direct the placement of the child." Neither the Taylors nor the De-Trattos requested or planned the fundraiser. Also, two bank accounts were established in Judy Taylor's name. One account was devoted to the debts of D.L.'s mother, and the other was devoted to the costs of seeking guardianship of D.L.

Schreck visited the Taylors approximately two to three times per week. Schreck described the relationship between the Taylors and D.L. as "very warm and loving"; D.L. appeared to be "very happy." Schreck opined that it would be in D.L.'s best interests if the Taylors were appointed his guardians.

James and Judy Taylor each testified at the dispositional hearing. Their marriage produced two daughters. They lived in an ethnically integrated, middle-class neighborhood in Chicago. James was a Chicago police officer, and Judy attended school 16 hours per week to become a registered nurse. During these hours, D.L. received care from James or DeTratto.

Alfredo visited D.L. weekly. Sometimes D.L. would cooperate during these visits, but other times he would cry and say that he did not want to accompany Alfredo. The Taylors would cooperate with any court order directing visitation by Alfredo. The Taylors opined that it would be in D.L.'s best interests if they were appointed D.L.'s guardians.

Frances Ryan was a neighbor of the Taylors for seven years. Ryan had taught for 17 years and was teaching first-grade students at a parochial school. From February 1986 until the date of her testimony, Ryan visited the Taylors four to five times per week. To Ryan, D.L. appeared to be "developing a good image of himself"; the Taylors appeared to be "loving, fair, and firm"; and the Taylors' daughters appeared to be "loving and yet they fight and yet they make up and they love as all children do."

Alfredo called several witnesses at the dispositional hearing. Maria Luna was Alfredo's sister (D.L.'s paternal aunt). She visited D.L. almost weekly when Alfredo brought D.L. to his home. D.L. appeared to interact well with Alfredo and his family. She described

both Alfredo's immediate family and their extended family as very close and loving. Additionally, Alfredo was financially able to raise D.L. Alfredo owned his own business. He employed a housekeeper. His home was sufficiently large for D.L. Maria Luna opined that Alfredo's family would take good care of D.L.

Maria was Alfredo's wife. She had been married to Alfredo for four years and they had two, two-year-old daughters. Although Maria was a licensed beautician, she was a homemaker. Maria knew how to care for children. They also employed a part-time housekeeper. Alfredo's family had known D.L. from his birth and enjoyed his visits. If they were appointed D.L.'s guardians, D.L. would have his own room and speak both English and Spanish. Maria would treat D.L. as she would treat her other children.

Alfredo testified that he was in regular contact with D.L. since his birth. Alfredo owned an auto parts and repair business. He could support D.L. if appointed his guardian. Alfredo had two children by a previous marriage, but these children lived with his ex-wife.

Alfredo noted that D.L. was treated for asthma. Alfredo opined that smoking affects asthma, and noted that he did not smoke while his wife smoked approximately one pack of cigarettes per month. However, he believed that Judy Taylor smoked "heavily."

D.L. interacted well with his immediate family, and Alfredo would treat D.L. as his own. Alfredo would see that D.L. received an education "as far as [D.L.] could go," and would raise the child bilingually and biculturally. Alfredo would love and care for D.L. whether or not he was appointed the child's guardian. However, he believed that it would be in D.L.'s best interests if he were appointed D.L.'s guardian. Alfredo sought guardianship of D.L. not only to support the paternal side of D.L.'s family, but most importantly, to secure D.L.'s best interests.

On April 16, 1987, with all counsel present, the trial court interviewed D.L. in chambers. The child was nearly three years old. The interview shed no light on the matter. In essence, D.L. first stated that he certainly would like to live with the Taylors. He subsequently stated that he certainly would like to live with Alfredo. D.L. lastly stated that he would like to live with the Taylors.

D.L., Sr., presented one witness at the dispositional hearing. DCFS caseworker Linda Johnson was assigned to D.L.'s case in June 1986. She investigated the households of Alfredo and the Taylors, and interviewed D.L., Sr., in Cook County jail. She stated that Alfredo could financially support D.L. without State assistance, while the Taylors could qualify for public funds. Johnson concluded that the home

of either the Taylors or Alfredo would adequately meet D.L.'s needs. However, in terms of D.L.'s emotional bonding, Johnson "saw the Taylors as one up on [Alfredo]."

At the close of the dispositional hearing, the trial court appointed the Taylors as D.L.'s guardians. The court stressed at the outset that the sole issue was the best interest of D.L. The court considered many factors in this determination. These factors included the bonding or emotional ties between the parties and D.L., and the lengths of time D.L. had "lived in a stable, satisfactory environment and the desirability of maintaining continuity." The court concluded that both the Taylors and Alfredo's family "are eminently qualified" to be appointed guardians of D.L. However, the trial court ruled that it was in D.L.'s best interest that the Taylors be appointed his guardians.

D.L., Sr., was subsequently convicted of the voluntary manslaughter of D.L.'s mother and is now serving a prison sentence on the conviction. D.L., Sr., appeals.

## OPINION

We note at the outset the controlling law. The Juvenile Court Act codifies the well-recognized principle that parents have the inherent right to the custody of their children. *In re Martin* (1975), 31 Ill. App. 3d 288, 292, 333 N.E.2d 711, 714 (and authorities cited therein).

However, the rights of parents to the custody of their children are not absolute. "On the contrary, they must yield at all times to the paramount factor of the welfare and best interests of the child or children involved." (*Martin*, 31 Ill. App. 3d at 292, 333 N.E.2d at 714.) In appropriate circumstances, the State, as *parens patriae*, may properly step in and substitute itself as the guardian of minors within its jurisdiction. Such circumstances include where parents are unable to care for children in their custody. (*In re Wheat* (1979), 68 Ill. App. 3d 471, 476, 386 N.E.2d 278, 282; Ill. Rev. Stat. 1985, ch. 37, pars. 702–1, 702–5(1)(b).) "[I]t is well established that the paramount consideration in all guardianship and child custody cases is the best interest of the child." *In re Violetta B.* (1991), 210 Ill. App. 3d 521, 533, 568 N.E.2d 1345, 1353; see Ill. Rev. Stat. 1985, ch. 37, par. 701–2(3)(c).

We further note that D.L., Sr., who is currently serving a prison sentence, obviously does not seek custody of D.L. for himself. Rather, he seeks guardianship on behalf of his brother Alfredo. A parent's inherent right to the custody of his or her child cannot be transferred by an absolute assignment to someone other than the other parent. This court will not allow the preference of D.L., Sr., to overcome the

State's legitimate interest in D.L. as *parens patriae*. See *Bryant v. Lenza* (1980), 90 Ill. App. 3d 275, 282-83, 412 N.E.2d 1154, 1159-60.

It is additionally well settled "that wide discretion is vested in the trial judge to an even greater degree than any ordinary appeal to which the familiar manifest weight principle is applied." (*Martin*, 31 Ill. App. 3d at 293, 333 N.E.2d at 715.) This deference is justified by the delicacy and difficulty of child custody cases. (*In re Stilley* (1977), 66 Ill. 2d 515, 520, 363 N.E.2d 820, 822.) Thus, a court of review will not disturb a trial court's determination in a child custody case unless the trial court exceeded its broad discretion, or the court's determination results in manifest injustice or is palpably against the weight of the evidence. (*Stilley*, 66 Ill. 2d at 520, 363 N.E.2d at 822; *Martin*, 31 Ill. App. 3d at 293, 333 N.E.2d at 715.) Having noted these fundamental principles, we now address the specific assignments of error.

## I

D.L., Sr., first contends the trial court erred by holding the temporary custody hearing without the presence of his counsel. D.L., Sr., claims that he was denied the procedural safeguards guaranteed by the Juvenile Court Act.

In *In re E.L.* (1987), 152 Ill. App. 3d 25, 504 N.E.2d 157, this court stated as follows:

> "Due process is not a technical concept unrelated to time, place, and circumstances; rather, it is flexible and calls for such procedural protections as a particular situation demands. [Citation.] Procedural aspects of due process require that a person be given notice and an opportunity to be heard and to defend in an orderly proceeding adapted to the case. [Citation.] Due process is not denied when a party fails to avail himself of the opportunity to be heard after it is offered to him. [Citation.] While section 1—20 of the Juvenile Court Act (Ill. Rev. Stat. 1981, ch. 37, par. 701—20(1)) entitles respondents to certain rights including the right to be present [and represented by counsel] and to cross-examine witnesses, the proceedings are not intended to be adversary in character. The primary concern is the best interests and welfare of the child. [Citation.]" 152 Ill. App. 3d at 33, 504 N.E.2d at 162.

Applying these principles to the case at bar, we conclude that D.L., Sr., received adequate procedural due process at the temporary custody hearing. D.L., Sr., and his counsel had notice of the hearing. On the scheduled day of the hearing, the trial court delayed the hearing for approximately 2½ hours. Both D.L., Sr., and Alfredo spoke at

the hearing. Thus, D.L., Sr., received notice and an opportunity to be heard and to defend. Further, the trial court cannot be said to have denied D.L., Sr., the right to counsel when it was his counsel who failed to appear at the scheduled time. In the context of this non-adversarial proceeding, which focused on the best interests of D.L., we cannot say that the trial court's action resulted in manifest injustice.

## II

D.L., Sr., next assigns error to the trial court's ruling that the Taylors were proper parties to the proceedings. The parties to a juvenile proceeding are "the minor who is the subject of the proceeding and his parents, guardian, legal custodian or responsible relative." (Ill. Rev. Stat. 1985, ch. 37, par. 701—20(1).) D.L., Sr., acknowledges that the Taylors were D.L.'s temporary custodians. However, D.L., Sr., argues that temporary custody does not equal legal custody, so as to confer party status on the temporary custodian. He reasons that "temporary custody is merely a temporary placement of the minor out of the custody of his or her parent or guardian [citations]; legal custody involves broader rights and obligations."

The Juvenile Court Act defines legal custody as follows:

> "§1—12. Legal Custody. 'Legal Custody' means the relationship created by an order of court which imposes on the custodian the responsibility of physical possession of a minor and the duty to protect, train and discipline him and to provide him with food, shelter, education and ordinary medical care, except as these are limited by residual parental rights and responsibilities and the rights and responsibilities of the guardian of the person, if any." Ill. Rev. Stat. 1985, ch. 37, par. 701—12.

■ We agree with the Taylors that, as D.L.'s temporary custodians, they were effectively his legal custodians. Therefore, they were proper parties to the proceedings. The record shows that, as a consequence of their appointment as temporary custodians, the Taylors undertook all of the responsibilities included in the statutory definition of legal custody. "Where the circumstances of a case indicate that a person other than a parent has a substantial interest in a minor in proceedings in the juvenile court, then under the contemplation of the Act that person is a necessary party to the proceedings." (*In re Anast* (1974), 22 Ill. App. 3d 750, 756, 318 N.E.2d 18, 22.) The fact that the Taylors were appointed D.L.'s temporary custodians and were effectively his legal custodians distinguishes this case from *In re Winks* (1986), 150 Ill. App. 3d 657, 502 N.E.2d 35. After reviewing

the entire record, we cannot say that the trial court exceeded its discretion.

## III

D.L., Sr., next contends the trial court erred at the dispositional hearing by denying his motion to exclude witnesses from the hearing when they were not testifying. He claims that each of the Taylors' witnesses "structured" his or her testimony to conform to that of the others.

■ We cannot accept this contention. It has long been settled that proceedings under the Juvenile Court Act are civil in nature. (*In re J.J.* (1991), 142 Ill. 2d 1, 8, 566 N.E.2d 1345, 1348-49 (and cases cited therein).) Thus, the general rules of civil practice apply. (*In re Harpman* (1986), 146 Ill. App. 3d 504, 512, 496 N.E.2d 1242, 1246.) It is quite settled that the exclusion of witnesses from a courtroom is a matter resting in the sound discretion of the trial court. *In re Marriage of Kaplan* (1986), 149 Ill. App. 3d 23, 29, 500 N.E.2d 612, 616-17; *Darling v. Charleston Community Memorial Hospital* (1964), 50 Ill. App. 2d 253, 322, 200 N.E.2d 149, 184.

In the case at bar, the trial court reasoned that since all of the witnesses were interested in D.L., they should hear the evidence that pertained to him. We cannot say that the trial court exceeded its discretion.

## IV

D.L., Sr., lastly assigns error to the trial court's admission of improper opinion testimony. D.L., Sr., argues that: (1) McGrath's testimony of Weber's expert opinion constituted hearsay; (2) the opinion of each of the Taylors' witnesses that it would be in D.L.'s best interests if he remained with the Taylors constituted impermissible speculation about matters outside of their knowledge; and (3) Schreck's references to the views held by the Taylors' neighbors were irrelevant.

Section 5—1(1) of the Act allows the trial court at a dispositional hearing to admit into evidence "[a]ll evidence helpful in determining [the] question[ ] [of disposition]." (Ill. Rev. Stat. 1985, ch. 37, par. 705—1(1).) This provision "shows a clear intention that juvenile courts have wide latitude in admitting evidence at dispositional hearings." (*In re White* (1982), 103 Ill. App. 3d 105, 111, 429 N.E.2d 1383, 1389.) Although hearsay and other types of incompetent evidence may not be admissible at the adjudicatory hearing, they are admissible at the dispositional hearing. (*In re Brooks* (1978), 63 Ill. App. 3d 328, 341, 379 N.E.2d 872, 882; *In re Prough* (1978), 61 Ill. App. 3d 227,

231, 376 N.E.2d 1078, 1082.) Further, we presume that the trial court relied only upon competent evidence in making its determination. See *Prough*, 61 Ill. App. 3d at 232, 376 N.E.2d at 1082.

Based on these principles, we cannot accept this contention. We conclude that the admission of all of the evidence of which D.L., Sr., complains was well within the discretion of the trial court. After carefully reviewing the entire record, from which we recited at length, we cannot say that the trial court exceeded its discretion or that the trial court's determination resulted in manifest injustice or was palpably against the weight of the evidence.

For the foregoing reasons, the order of the circuit court of Cook County is affirmed.

Affirmed.

JIGANTI, P.J., and McMORROW, J., concur.