NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251256-U

NOS. 4-25-1256, 4-25-1257, 4-25-1258 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 10, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.T., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Rock Island County |
| Petitioner-Appellee, | ) | Nos. 24JA81 |
| v.      (No. 4-25-1256) | ) | 24JA82 |
| Anthony T., | ) | 24JA83 |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | |
| *In re* A.T., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.      (No. 4-25-1257) | ) | |
| Anthony T., | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | |
| *In re* K.T., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.      (No. 4-25-1258) | ) | Honorable |
| Anthony T., | ) | Norma Kauzlarich, |
| Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Lannerd and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The trial court did not abuse its discretion by entering a dispositional order
(1) requiring respondent to complete services and (2) finding respondent unable,
for reasons other than financial circumstances alone, to care for the minor
children.

¶ 2        Respondent, Anthony T., is the father of L.T. (born March 2019), A.T. (born April 2022) and K.T. (born December 2024). (The minors' mother, Trinity B., is not involved in this appeal.) In December 2024, the State filed petitions for adjudication of wardship, alleging that L.T., A.T., and K.T. were neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2024)) and that K.T. was born drug-exposed (*id.* § 2-3(1)(c)). That same month, the trial court conducted a temporary custody hearing and placed the minors in the temporary custody of the guardianship administrator for the Illinois Department of Children and Family Services (DCFS).

¶ 3        In July 2025, the trial court adjudicated the minors neglected and entered a dispositional order (1) finding respondent unable, for other than financial reasons alone, to care for L.T., A.T., and K.T. and (2) placing custody of the minors with DCFS. The court's order also required respondent to "comply with any recommended services."

¶ 4        Respondent appeals, arguing that the trial court erred by entering a dispositional order that (1) did not return his children to his care and (2) required him to complete services. We disagree and affirm.

¶ 5                                I. BACKGROUND

¶ 6                        A. The Petitions and Temporary Custody Hearing

¶ 7        In December 2024, the State filed petitions for adjudication of wardship, alleging that L.T., A.T., and K.T. were neglected in that their environment was injurious to their welfare. *Id.* § 2-3(1)(b). The State also alleged that K.T. was born drug exposed. *Id.* § 2-3(1)(c). The petitions specifically alleged that, in December 2024, DCFS received a report that Trinity was suspected to be on drugs when A.T. was born and that both Trinity and respondent "were behaving as if they were under the influence of stimulants during the hospitalization" in that they

- 2 -

"were irritable and repeatedly scratching themselves." Subsequently, K.T.'s "cord blood toxicology lab results came back positive for methamphetamine and amphetamine."

¶ 8    Five days after K.T.'s birth, when a DCFS investigator attempted to visit Trinity at her home, respondent, who was present, denied living in the home but refused to allow the investigator to "look around the home," despite Trinity's consent for the investigator to do so. That same day, during a return visit to the home, respondent "became argumentative with" the DCFS investigator and "refused to take an oral toxicology test."

¶ 9    The petitions further alleged that Trinity had a prior indicated report from 2020 for death by neglect for another child, who died at two days old due to "methamphetamine and ephedrine toxicity."

¶ 10    Also in December 2024, the trial court conducted a temporary custody hearing and placed both minors in the custody of the guardianship administrator of DCFS.

¶ 11    B. The Preadjudication Proceedings and the Adjudicatory Hearing

¶ 12    In January 2025, the trial court conducted a pretrial hearing, at which respondent filed a voluntary acknowledgement of paternity form for each minor.

¶ 13    In March 2025, the parties convened for an adjudicatory hearing. Respondent advised the trial court that he had filed rescissions of his voluntary acknowledgement of paternity forms. As a result, the court (1) "relieve[d]" respondent's attorney of his representation of respondent and (2) at the State's request, ordered respondent to submit to DNA testing to determine paternity. Respondent told the court he would not comply, and the court advised him that he could be jailed for contempt if he violated a court order.

¶ 14    In April 2025, the trial court conducted an adjudicatory hearing, at which the prosecutor, guardian *ad litem* (GAL), and attorney for Trinity submitted a written "Factual Basis

for a Stipulation," which the court accepted and found supported a finding of neglect. Although respondent was present for the hearing, he was not represented by counsel because his paternity had not yet been established through DNA testing.

¶ 15 The written stipulation stated that a DCFS investigator would testify consistently with the allegations in the petitions but also added that L.T. disclosed during an interview at the Rock Island County Children's Advocacy Center (CAC) that respondent resided in the family home and " 'whoop[ed]' " them with a black belt when they got into trouble. L.T. emphasized that respondent struck her " 'hard, hard, hard' " with the belt. The stipulation further stated that the investigator would testify that respondent (1) was in the home at the time of the death of his two-day-old child in 2020 and (2) "refused to provide random drug screens" during the investigation into the death.

¶ 16 At the State's request and without objection, the trial court admitted a "prior indicated report in [the] DCFS case" involving the 2020 death of the minors' sibling, I.T. According to that report, I.T. was born on May 14, 2020, and Trinity and I.T. were discharged from the hospital two days later. On May 17, 2020, police were dispatched to Trinity's home when Trinity, who had been sleeping in bed with I.T., discovered that I.T. was cold and not breathing. Trinity yelled for respondent, who was in the living room, to call 911. Following an autopsy, I.T.'s cause of death was determined to be "methamphetamine and ephedrine toxicity."

¶ 17 In May 2025, the trial court received the results of the DNA testing, which established that respondent was indeed the father of the minors. As a result, the court reappointed counsel to represent respondent.

¶ 18 C. The Dispositional Hearing

¶ 19 In July 2025, the trial court conducted a dispositional hearing. At the State's

request and without objection by any party, the court took judicial notice of (1) an integrated assessment filed in May 2025 and (2) a dispositional report filed in July 2025.

¶ 20                              1. *The Integrated Assessment*

¶ 21           According to the May 2025 integrated assessment, respondent "declined to participate in any services, treatment, or the IA interview." Nonetheless, the DCFS employee preparing the report, Jessica Rojas, gathered information from (1) "[Statewide Automated Child Welfare Information System (SACWIS)] legal records," which included "Investigation Summary Handoff Documents" for the investigation into I.T.'s death, police reports, interview summaries, medical notes, previous investigations, related case notes, birth records, and the Law Enforcement Agencies Data System (LEADS) database, (2) "Comprehensive Health Examination" records for the minors, and (3) "Conversations with Permanency Worker" Kelli Forest.

¶ 22           The integrated assessment further noted that, although respondent was not indicated on any allegations surrounding I.T.'s death, "he was living in the home and around at the time of the death" and "[h]e declined services." Respondent had 13 previous criminal charges, resulting in three criminal convictions—namely, "Weapons Offense," "Flight Escape," and "Dangerous Drugs." The assessment also noted "concerns that [respondent] may be abusing substances given his presentation at the birthing hospital including increased irritability, scratching at his skin and overall frustration." According to the assessment, respondent was "aware of past exposure" of his children to drugs *in utero* but "has not made efforts to keep [Trinity] from further exposure for their current newborn, [K.A.]"

¶ 23           The assessment further noted that respondent "has had a volatile relationship with [Trinity,]" including a reported "escalated altercation in December 2023, where [respondent]

- 5 -

strangled [Trinity]."

¶ 24 Regarding parenting, the integrated assessment stated the following:

"[Respondent] demonstrates a pattern of avoidance when it comes to managing distress related to his children. He becomes distant and separated from [Trinity,] failing to protect his children or support the mother of his children. \*\*\* [Respondent] demonstrated significant parenting application concerns including complete disregard for the impact that his and his paramour's drug abuse has on their children's health, safety, and wellbeing. [Respondent] demonstrates an inability to safely care for his children, meet their basic needs consistently, and fails to protect them from witnessing violence in the home. Furthermore, he made no efforts to grieve and manage the loss after the death of his third child, [I.T.,] in 2020. [Respondent] is reported to use harsh corporal punishment towards his children, including whipping them on their arms, legs, backs, and buttocks."

¶ 25 Under a section titled, "Impressions," the integrated assessment reported as follows:

"There remain concerns that [respondent] is abusing substances, is abusive to his children, and has a history of strangulation towards [Trinity]. Should [respondent] voice an interest in reunification with his children, an assessment is recommended. It is important to determine his current mental and parenting functioning. Risk factors such as his propensity for violence, current or recent drug abuse, should be screened and a treatment plan should be developed in response to a comprehensive assessment to be complete[d] by the permanency team.

Parent Recommendations

*The following recommendations address safety and/or why the case came into care; (#60-Significant Risk of Physical Harm by Neglect and #65C-Substance Misuse by Neglect-Controlled Substance in a Newborn). \*\*\**

-It is recommended that [respondent] engage with child welfare services to complete an assessment, determine functioning, and service planning.

-It is recommended that [respondent] participate in a substance abuse assessment and comply with the recommended treatment.

-It is recommended that [respondent] participate in [a] partner abuse intervention program (PAIP).

-It is recommended that [respondent] participate in random drug screen[ing]."

¶ 26                                    2. *The Dispositional Report*

¶ 27        The dispositional report filed in July 2025 was prepared by Forest, the Center for Youth and Family Solutions (CYFS) permanency caseworker. Regarding respondent, the dispositional report stated as follows:

"*Housing and Income*

[Respondent's] primary residence is [in Springfield, Illinois]. Before the case opened, [respondent] reported that he would come up to the [Q]uad [C]ities frequently to see his kids. [Respondent] reports that he still stays in town occasionally with a friend but has not told this worker an exact address.

[Respondent] is currently unemployed.

*Visitation*

[Respondent] was originally offered to visit the kids whenever at the caregiver's house. Trinity offered [respondent] to go with her during her visits. [Respondent] never went over to visit with the kids. This worker offered visitation to [respondent] as well and [respondent] never wanted to. Due to [respondent] re[tr]acting his [voluntary acknowledgement of paternity], [respondent] was not allowed to visit with the kids until paternity was established. Since paternity was established, [respondent] has done 4 visits with the kids in the community. The visitation has gone well; [respondent] is very engaged with each kid and has provided food for all the kids.

*Parenting*

[Respondent] has stated to this worker that he does not want to be looped into Trinity's case and is [*sic*] does not see why parenting classes would help get his kids back.

*Substance Abuse*

[Respondent] has stated that he does not have a substance abuse problem and therefore does not see the need to take a substance abuse assessment. [Respondent] feels that completing a substance abuse assessment is saying that he uses drugs and [respondent] reports that he does not so [he] does not want to complete an assessment.

*Cooperation*

[Respondent] has always been polite and respectful to this worker but has not been willing to cooperate in certain parts of the case. [Respondent] has stated to this worker that it is Trinity's case, and he does not want to be clumped into her

case. Due to this, [respondent] did not complete the integrated assessment. If this worker asks to speak with [respondent] or meet with him, [respondent] is always willing to but states he does not want anything to do with DCFS. This worker discussed with [respondent] getting the court ordered DNA testing done and [respondent] did complete it. [Respondent] reports that he has no problem cooperating with services that will benefit him getting his kids back. However, the recommended services listed above he does not feel have anything to do with getting his kids back and therefore"

(We note that respondent's section of the report ended with the foregoing incomplete sentence.)

¶ 28    The dispositional report recommended that (1) DCFS be granted guardianship of each of the minors, "with the right to place," (2) the permanency goal for each of the minors be set as "Return Home within 12 months," and (3) respondent "participates in an Integrated Assessment interview and cooperate with recommended services."

¶ 29    After noting the filing of the integrated assessment and dispositional report, the trial court asked the State to proceed. The prosecutor did not present evidence and asked the court to "adopt the recommendations contained the report," noting that the author of the report was present and available to testify if necessary. The GAL also asked the court to adopt the recommendations in the dispositional report.

¶ 30    Respondent objected to the recommendations in the dispositional report, with his counsel stating as follows:

"Your Honor, my client's position is that this issue is between [Trinity] and the State, that he is an appropriate person to have care for the children, and he believes the children should be returned to him pending the outcome of whatever

- 9 -

is going on with [Trinity]."

¶ 31                                    3. *Respondent's Testimony*

¶ 32          Respondent's counsel then asked to call respondent to the witness stand.

¶ 33          The trial court responded to that request as follows:

"Sure. If you want to call him, *** in reviewing the dispositional report, I want to point out that [respondent] was indicated three different times for substantial risk of physical injury, environment injurious to the health and welfare of a child. So he certainly can testify why he would be [an] appropriate placement and why he didn't participate with an integrated assessment so that I can determine that.

Because, without that integrated assessment, I can't determine that he's an appropriate placement. Because, number one, during these proceedings—which, again, it was his right—he disavowed paternity of these children. I don't have a fixed place of residence. Either he lives here, or he doesn't. I don't know any of that stuff. So you certainly can call him, if you would like."

¶ 34          Respondent then testified as follows. He lived with his sister in a house in Springfield, Illinois, that was owned by his family and he had lived there for the last 10 years. Respondent was self-employed doing "[m]echanic work and cleaning." Before that, he never held a job. Respondent acknowledged he was the father of six-year-old L.T., three-year-old A.T., and seven-month-old K.T. He believed that the children should be placed in his care. Although the children had never lived with respondent, he had "spent a lot of time with [them]," and they knew every person in his family. Respondent's house had three bedrooms, but the children would stay in respondent's room with him. He did not know where his oldest child would go to

school but noted there were several schools close to his home. Respondent also testified that he would facilitate visitation between the children and their mother.

¶ 35 Respondent denied that he had ever "done drugs." He also disputed the allegation in the petition that he refused to take a drug test. Respondent stated that he initially agreed to take the test, but when the investigator came back from her car with the test kit, she asked him where he stayed. When she found out he lived in Springfield, she said he could not " 'get the kids anyway' " because he lived out of the county. Respondent also denied that he lived with Trinity at the time of the investigation and claimed that the investigator made untrue statements and was biased against him.

¶ 36 Respondent said he was now willing to (1) participate in an integrated assessment interview, (2) allow DCFS to view his home, (3) cooperate with DCFS, and (4) complete any services requested of him.

¶ 37 On cross-examination, the prosecutor asked respondent why he did not previously agree to participate in the integrated assessment interview. Respondent answered, "I felt I was being defamed by the investigator, and I felt that, if I did any kind of integrated assessments, that I would be admitting that I needed help raising my children, which I don't."

¶ 38 The prosecutor also asked respondent about I.T.'s cause of death, and he answered that she died of sudden infant death syndrome (SIDS). He insisted he saw SIDS identified as the cause of death on a piece of paper that Trinity showed him.

¶ 39 The trial court then asked respondent who else lived in his home in addition to him and his sister. Respondent answered that he also lived with his 22-year-old niece, who had a boyfriend that would come over. The court also asked respondent how many children he had, and respondent answered that he had seven children in total. When the court asked, "Where are

those children," respondent answered, "At the moment, I don't know exactly which state they stay in." He clarified that they were adults.

¶ 40          4. *The Trial Court's Oral Ruling and Written Dispositional Order*

¶ 41          The trial court ruled as follows:

"Had [respondent] participated in an integrated assessment and been cooperative at the beginning and his home would have been assessed that it was appropriate, then today he would be an absolute placement option. But he didn't do any of that.

And under the statute—here's the concern, [respondent], no offense, I don't know you from Adam. In this Court, this isn't a criminal proceeding. This is essentially a juvenile proceeding about the children. My concern is the children. Not you. Not [Trinity]. Again, not trying to be offensive. So my concern is the safety, health, and well-being of these children.

Do I believe that you're probably an appropriate parent? Yes. Do I believe [Trinity] is an appropriate parent? Yes. I'm slightly concerned because the allegations in the petitions are the behavior in the hospital with regards to this youngest child. Not only your behavior but [Trinity's] behavior. Your previous behavior here in court, *** I have the distinct impression and sense that you seem to think that people are out to get you.

And, as I said, if you participated in the [integrated assessment (IA)], they drop you one time and you don't have any drugs in your system—because I don't remember, but for some reason, I think this child was born with a substance dependency, which could come from you or her, quite frankly—

- 12 -

No, there's nothing for you to say. You've had the opportunity to say it. Genetics don't lie.

* * *

So the court is going to appoint DCFS as guardian of the minors with all of the attendant responsibilities therein. And I will appoint [the court-appointed special advocate]. Again, should [respondent] complete an IA and a safety check—and the goal is return home to either one of them—I don't have an issue with that. But until that happens, this Court's focus is these minor children that do not have a voice that have been subject to substance dependency by at least [their mother], for sure, and by omission for [respondent] for not protecting them."

¶ 42    The trial court entered a written order finding respondent "unable" to care for the minors. The order stated that respondent "needs to cooperate with the integrated assessment and comply with any recommended services." The court set the case for a status hearing to review respondent's progress with the integrated assessment.

¶ 43                              5. *Subsequent Proceedings*

¶ 44    In September 2025, Amy Kelley, a CYFS foster care family worker, filed a status report with the trial court, noting that respondent had completed the integrated assessment interview with a CYFS clinician, Kristy Hutchison and "no services have been recommended following the interview." Nonetheless, Kelley's status report continued as follows:

"Despite the [CYFS] clinician having no recommendation for services based on [respondent's] self-report interview, the child welfare team is continuing to recommend [respondent]:

1. Comply with randomly requested drug testing to ensure his

sobriety and appropriateness as a caregiver,

2. Complete parenting education to ensure he is educated on appropriate parenting practices after being intermittently involved in his children's lives and never the solo caretaker of the children,

3. Complete an anger management assessment and follow any recommendations in order to address the reported concerns for physical violence in [respondent's] recent history,

4. Continue to cooperate with the agency in regards to signing consents, complying with visitation expectations, and maintaining contact with the family worker[.]

These recommendations are in accordance with the original integrated assessment filed with the court. The Service Plan is being altered to reflect these minimized recommendations."

¶ 45    In October 2025, the State filed a "Motion to Amend the Supplemental Dispositional Order to Include Court-Ordered Services for the Father," asking the trial court to amend the dispositional order to require the services recommended by Kelley in her September 2025 status report. The State noted that (1) "a parent interview is only one component of an Integrated Assessment," (2) certain statements made by respondent during the interview conflicted with evidence of record, and (3) Hutchison's transcribed interview notes recommended " 'no *additional*' " services based upon her interview. (Emphasis in original.)

¶ 46    Respondent did not file a written response to the State's motion.

¶ 47    That same month, the trial court conducted a hearing on the State's motion. The State did not present any evidence but noted that the clinical interviewer was present and

- 14 -

available to testify if necessary. Regarding argument, the State stood on its motion. The GAL did not present any evidence and stated that she supported the State's motion.

¶ 48      Respondent's counsel did not present any evidence and argued in opposition to the motion. Specifically, counsel asserted that the clinical interviewer, who was the person who had "spent the most time with him," did not believe that respondent "needed many of the services that [were] being requested." Counsel stated that respondent was "willing to take substance abuse tests," but respondent did not "believe he needs other services."

¶ 49      The trial court began its ruling by reciting a detailed timeline of the case. The court noted that the State filed the petitions in December 2024 and respondent signed voluntary acknowledgements of paternity in January 2025. In March 2025, respondent rescinded his voluntary acknowledgements of paternity and requested genetic testing of the minors. In April 2025, Trinity stipulated to the allegations in the petitions; at that time, respondent was "out of it because he denied paternity, and his thoughts and opinions didn't matter." In May 2025, following genetic testing, the court entered an order establishing respondent's paternity of the minors.

¶ 50      The trial court then observed, "Throughout this backdrop, [respondent] refused to cooperate with the integrated assessment, and one was nonetheless completed based on LEADS information, prior DCFS reports, et cetera." In July 2025, the court conducted a "contested dispositional hearing," at which the court ordered respondent to "comply with an [integrated assessment] to determine what, if any, additional services were recommended, and he complied with that [order]." In September 2025, "a status alert was filed regarding [respondent's] integrated assessment."

¶ 51      The trial court then noted that its obligation was toward "the best interest of the

children, not the best interest of the parents," and it continued its ruling as follows:

"Here, it seemingly appears [respondent] is not fully committed to addressing the harmful environment that these children have been exposed to, especially here where there are allegations of substance abuse and another child's death due to substance toxicity. This history and [respondent's] refusal to honestly acknowledge the circumstances of [I.T.'s] death significantly heightens this Court's concerns and strengthens the justification for mandatory services. ***

***[T]he Court previously ruled and adjudicated these children as [neglected] due to injurious environment for ongoing substance abuse within the household. The minor sibling [I.T.] died in 2020 as a result of methamphetamine and Ephedrine toxicity overdose in the family home. [Respondent] has demonstrated a lack of insight into the circumstance that led to [I.T.'s] death and DCFS's current neglect findings. With these children ***, given the youngest child's blood cord analysis testing was positive for methamphetamine and amphetamine.

The Court finds that the father's failure to acknowledge the risk factors and his resistance to engaging in remedial services pose a continuing threat to the minors' safety and well-being. It is thus hereby ordered that, pursuant to 705 ILCS 405/2-23(3), the Court is imposing the following conditions on [respondent] as part of the previously-entered dispositional order:

Successful enrollment, attendance, and completion of the parenting education as [respondent] has never been the sole caretaker of these children. By his own testimony, he has only intermittently lived with the children. He comes

up and stays sometimes is what he said.

Random [urinalysis]. Upon any positive test, [respondent] will be ordered to obtain a substance abuse evaluation and comply with any and all recommended treatment. Only if he tests positive.

He's to complete an anger management comply with treatment [*sic*]. He's to obtain and maintain income and appropriate housing, engage in a visitation plan, cooperate with the agency and its assigns, to include the signing of any and all releases."

¶ 52 Shortly thereafter, but still during the trial court's oral ruling, the following exchange occurred between the court and respondent:

"[RESPONDENT]: I have done nothing.

* * *

THE COURT: You have omitted your duties, responsibilities, and obligations to these children to ensure that they are not exposed to an injurious environment.

[RESPONDENT]: That is not my responsibility.

THE COURT: Yes, it is. You're the father.

[RESPONDENT]: I'm not the mother.

THE COURT: You're the father.

[RESPONDENT]: They have never been in my care.

THE COURT: That makes it even worse. I can't put them in your—

[RESPONDENT]: That means you're punishing me.

THE COURT: No, sir. I'm not."

¶ 53    The trial court then entered a written order consistent with its oral ruling. The court's order was titled "Supplemental Order" and specifically stated that it "supplements the original dispositional order entered 7/25/25."

¶ 54    This appeal followed.

¶ 55                                II. ANALYSIS

¶ 56    Respondent appeals, arguing that the trial court erred by entering a dispositional order that (1) did not return his children to his care and (2) required him to complete services. We disagree.

¶ 57                            A. The Applicable Law

¶ 58    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2024)) provides a systematic framework for determining when a minor can be removed from his or her parents and made a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18. A trial court must make a finding of abuse, neglect, or dependence regarding a child before it can adjudicate the child a ward of the court. 705 ILCS 405/2-10 (West 2024).

¶ 59    If the trial court finds a minor to be abused, neglected, or dependent, the case then proceeds to a dispositional hearing, at which the court considers the following:

> "(1) whether it is in the best interest of the child to be made a ward of the court;
> (2) 'the proper disposition best serving the health, safety, and interests of the
> minor and the public'; (3) the permanency goal set for the minor; (4) 'the nature
> of the service plan for the minor'; and (5) 'the services delivered and to be
> delivered under the plan.' " *In re M.D.*, 2022 IL App (4th) 210288, ¶ 63 (quoting
> 705 ILCS 405/2-22(1) (West 2020)).

"At this hearing, the court may rely on all evidence that is 'helpful in determining these

- 18 -

questions,' including oral and written reports, 'even though not competent for the purposes for the adjudicatory hearing.' " *Id.*

¶ 60    A proper disposition may include removal of the minor from the custody of his or her parents if the trial court determines that "the parents *** are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so," and "that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." 705 ILCS 405/2-27(1) (West 2024).

¶ 61    A finding on any one of these three grounds—unfit, unable, or unwilling—provides a proper basis for removal. *In re Lakita B.*, 297 Ill. App. 3d 985, 992-93 (1998).

¶ 62    Once a minor is made a ward of the court, the trial court's dispositional order may include "any other orders necessary to fulfill the service plan, including, but not limited to *** orders requiring parties to cooperate with services." 705 ILCS 405/2-23(3) (West 2024). "The conditions of a dispositional order must have some basis in the evidence." *In re K.S.*, 365 Ill. App. 3d 566, 570 (2006).

¶ 63    A trial court's ruling at a dispositional hearing "will be reversed only if the findings of fact are against the manifest weight of the evidence or the court committed an abuse of discretion by selecting an inappropriate dispositional order." *In re J.W.*, 386 Ill. App. 3d 847, 856 (2008). "The trial court's finding is against the manifest weight of the evidence if a review of the record 'clearly demonstrates' that the opposite result was proper." *Lakita B.*, 297 Ill. App. 3d at 994. Moreover, in child custody cases, " 'wide discretion is vested in the trial judge to an even greater degree than any ordinary appeal to which the familiar manifest weight principle is applied.' " *Id.* (quoting *In re D.L.*, 226 Ill. App. 3d 177, 185 (1992), citing *In re Martin*, 31 Ill.

App. 3d 288, 293 (1975)).

¶ 64                                    B. This Case

¶ 65        Respondent challenges the trial courts dispositional order on two separate bases—namely, he argues the court lacked evidence to (1) order the continued removal of the minors from his care and (2) require him to complete services. We disagree with both arguments.

¶ 66        Regarding the trial court's order finding respondent unable to care for the minors, respondent argues that "[i]t is undisputed that [respondent] is a fit parent," presumably referring to the court's finding respondent was unable instead of unfit. By framing his argument in this manner, respondent ignores the well-established principle that a finding on any one of the three statutory bases—unfit, unable, or unwilling—is sufficient to support an order removing minors from a parent's care. *Id.* at 992-93.

¶ 67        And respondent makes no clear or persuasive argument that the trial court erred by finding him unable to care for the minors. Respondent contends that "the court only found [him] to be 'unable' at the original dispositional hearing, stating that if '[respondent's] home would have been assessed that it was appropriate, then today he would be an absolute placement option;' " however, "due to not having an integrated assessment and lack of information on the situation, the court found at that time [respondent] was unable." Respondent erroneously asserts that because he eventually participated in an integrated assessment interview, "which found that he did not need to complete any services," the court lacked evidence "to refute that [respondent] is both a fit and able parent to care for the minors."

¶ 68        Respondent's argument incorrectly assumes that the integrated assessment did not recommend services. The clinician that conducted the parent interview concluded that she had no *additional* recommendations for services following her interview. But, as the State noted in its

motion to supplement the dispositional order, the parent interview is merely one component of the integrated assessment. Importantly, the CYFS child welfare team continued to recommend multiple services following respondent's participation in the interview "in accordance with the original integrated assessment," including random drug testing, parenting classes, anger management, and visitation with the minors.

¶ 69    Respondent's argument challenging the trial court's ordering him to complete services is premised on the same erroneous assertion; respondent contends that "at the original dispositional hearing, the only thing [respondent] needed to complete was the integrated assessment so the court could determine if he needed to complete services." However, the original dispositional order required respondent "to cooperate with the integrated assessment and comply with any recommended services."

¶ 70    The need for each of these services to ensure the safety and welfare of the minors prior to returning them to respondent's care was well-supported by the evidence of record. Respondent has a history of a criminal drug conviction, was present when I.T. died of methamphetamine and ephedrine toxicity, behaved sufficiently strangely at the hospital when K.T. was born to arouse suspicions of current drug use, and K.T. was also born drug exposed. Respondent has never been the primary caretaker of his children. His children have reported that he punishes them by striking them very hard with a belt. The integrated assessment reported that Trinity stated respondent strangled her in December 2023 during an argument. All of this evidence supports the court's (1) finding that respondent was "unable, for other than financial reasons alone, to care for, protect, train or discipline the minor(s)" and (2) ordering respondent to complete the relevant services prior to returning his children to his care.

¶ 71    The trial court in this case, at all stages, provided detailed and thorough

explanations for its rulings, including its finding that respondent has failed to protect his children from their mother's drug use, which aided this court in the resolution of this appeal. We commend the court for doing so and encourage others to follow its example.

¶ 72                                    III. CONCLUSION

¶ 73            For the reasons stated, we affirm the trial court's judgment.

¶ 74            Affirmed.