*In re* J.P., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Karen P., Respondent-Appellant).

First District (4th Division) Nos. 1—96—3323, 1—97—0003, 1—97—0024 cons.

Opinion filed February 26, 1998.

992

Schiller, DuCanto & Fleck, of Chicago (Donald Dorman and Sarane C. Siewerth, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Nancy L. Grauer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

Courts, as they should, tread carefully when dealing with claims of child abuse. This case concerns such a claim, and it raises other compelling questions that must be addressed: When is it legally appropriate for the State to exercise a degree of power that removes a child from the custody of her mother, making the child a ward of the court? What facts are required to justify that kind of intrusion into family life?

In this case we find the trial court erred when it determined a mother imposed excessive corporal punishment on her daughter within the meaning of the Juvenile Court Act of 1987 (705 ILCS 405/ 1—1 et seq. (West 1994)). Because we find the child was not abused, we vacate the order making her a ward of the court.

FACTS

On June 20, 1995, the Department of Children and Family Services (DCFS) filed a petition for adjudication of wardship and motion for temporary custody. In the petition, DCFS stated that Jessica P., born April 24, 1991, had been removed from her mother's home on June 16, 1995, because she was neglected and abused. The petition alleged Jessica was neglected due to an "injurious environment." 705 ILCS 405/2—3(1)(b) (West 1994). The allegations of abuse were premised on physical abuse and excessive corporal punishment. The petition said Jessica had "sustained cuts, welts, and bruises on her buttocks and legs as a result of being beaten by mother." 705 ILCS 405/2—3(2)(i), (v) (West 1994). The petition further alleged there was a substantial risk that Jessica might sustain physical injury in the future because her mother "refused to accept services." 705 ILCS 405/2—3(2)(ii) (West 1994). The accompanying motion for temporary custody stated there was "urgent and immediate necessity" to take the child into custody, the severity of the injuries and seriousness of the allegations made it "too risky" to leave the child in the home, and "reasonable efforts cannot prevent or eliminate the necessity of removal of the child from the home." See 705 ILCS 405/2—10(2) (West 1994). A temporary custody hearing (705 ILCS 405/2—9, 2—10 (West 1994)) was held the same day.

At the hearing, the court learned that Jessica's parents, Scott (also Scott P.) and Karen (also Karen P. or respondent), obtained a judgment of divorce on December 21, 1994. They had been separated for more than a year before the divorce became final. Pursuant to the agreed custody order in the divorce judgment, Karen and Scott maintained joint custody of Jessica; Karen was to have physical custody, and Scott received visitation.

Six weeks after the divorce, Scott married Kim. Later, Karen became engaged to marry Bill in September 1995.

On June 11, 1995, Scott visited the Schaumburg police department and met with Detective Smith to report his ex-wife's use of corporal punishment. Scott told Detective Smith about an incident that occurred six months earlier, in December 1994. When he got Jessica for visitation, Scott said, Karen told him she had disciplined Jessica using a wooden spoon and had caused a bruise on her buttocks. Scott didn't report this incident until now, he said, because he hadn't been concerned until Jessica reacted strangely on a recent boating trip. He said Jessica became frightened by the boat's oars because they resembled "the rod" Jessica's mother used to discipline her.

On June 12, 1995, Sharon Dorfman, a DCFS worker, was assigned to investigate Scott's report, which had been relayed to the child abuse hotline. Within 24 hours of receiving the report, Dorfman visited Karen at her home. Dorfman described Karen as "receptive" and cooperative. Karen readily admitted using "the rod" (a wooden spoon) for discipline. Karen said she did this because of parenting classes and teachings she received in her church. Karen explained that she believed it was wrong to hit with the hand because the hand represents love. Therefore, it was better, Karen thought, to use an object such as the wooden spoon, instead of the hand, to discipline.

Karen demonstrated to Dorfman the manner and force she used when disciplining Jessica. Karen said she hit Jessica only on her buttocks, over clothing, and her intent was not to harm, but to cause a "sting" to get her attention. Though Karen said she had been using "the rod" regularly, Karen admitted to causing a bruise on Jessica's buttocks on only one occasion, six months earlier. Later in the investigation this bruise was found to have been about 1 inch in size. Throughout the entire investigation, DCFS never uncovered any further evidence that Jessica ever sustained additional bruises or observable injury as a result of the spankings.

Dorfman told Karen that hitting Jessica with a spoon could be excessive corporal punishment if it caused bruises. She asked Karen to refrain from using the rod for discipline. Dorfman also offered

Karen counseling and parenting classes so she could learn some alternative methods of discipline. Karen refused the counseling but agreed to attend parenting classes.

Because Karen refused to allow Dorfman to inspect Jessica for bruises, Dorfman asked Detective Smith to visit Karen. Detective Smith, along with a female officer, visited Karen that same day. Detective Smith said Jessica was wearing a swimsuit and no bruises were evident.

Detective Smith spoke to Karen about using "the rod" and urged her to stop this practice. Karen explained, however, that she never hit Jessica out of anger. Going to get the rod gave her a "cooling off" period. Karen also spoke to Jessica about the behavior and, after the discipline, they would pray and she would give Jessica forgiveness.

Detective Smith said he warned Karen she could be arrested for battery. He confiscated the nine-inch wooden spoon Karen had been using as "the rod." He also asked Karen to bring Jessica to the Child Advocacy Center the next day for an interview.

The following day, on June 14, 1995, Jessica was interviewed at the Child Advocacy Center. Detective Smith watched the interview through a two-way mirror. He said Jessica exhibited no signs of abuse. She was unafraid of the interviewer and appeared "normal" and healthy. He said Jessica told the interviewer that she got hit "lots" when she was "foolish" and she got hit even more if she cried. He couldn't remember whether Jessica said her butt sometimes got "blue" or if she said "red." He became concerned, however, because Jessica reported that she had been disciplined with the rod the night before.

Detective Smith informed Dorfman of Karen's recent use of the rod. Dorfman made an appointment to visit Karen on June 16, 1995. At this second visit, Dorfman and Detective Smith questioned Karen together. Again, Karen openly admitted that she used the rod on Jessica. Karen said she disciplined Jessica "for urinating." Karen told them she typically struck Jessica "about four times or until her behavior was proper."

Dorfman asked Karen if she would refrain from using the rod on Jessica until she began attending parenting classes. Karen refused. After thoughtful reflection, Karen said she would not stop using the rod because that would mean she didn't love Jessica.

Dorfman characterized Karen as "honest" and straightforward. Dorfman said she would have left Jessica in the home if Karen said she would stop using the rod. Because Karen refused to stop using the rod, however, Jessica was taken into protective custody. A second, 12-inch wooden spoon, which Karen had used to discipline Jessica, was confiscated by Detective Smith at this time.

Karen testified at the temporary custody hearing. Though she verified all that had been testified to by Dorfman and Detective Smith, Karen said she would agree to stop using the rod for discipline. Karen said she believed the rod was an effective form of discipline, but she would discontinue its use because she didn't want her child to have to go through the disruption and confusion of the court proceedings. She also did not want to be separated from her daughter anymore. Karen informed the court she had already begun the process of signing up for parenting classes.

After hearing the evidence, Judge Aron ruled:

"Okay; the court does find first of all that both mother and father were present in court today; that Probable Cause does exist; that the minor is abuse [sic] or neglected based on the testimony heard today about the mother admitting hitting the Minor with the wooden spoons and leaving bruises and her belief in the rod of correction.

I believe that Urgent and Immediate Necessity does exist to support removal of the Minor from the home. Once again I believe mother is probably one of the most honest and sincere people that I have ever seen in this room. I believe her religious beliefs are not superficial, even though she wants to stop this invasion of her home and her privacy; that I believe those religious beliefs need to be talked out a little more or thought about a little bit more; for that reason I don't believe that she can change easily, even though she wants to or says she wants to today.

I think reasonable efforts have been made but have not eliminated the Urgent and Immediate Necessity to remove this child from the home. The Minor should be removed. Temporary Custody has been granted to DCFS guardianship administrator [sic] with the right to place the Minor into and consent to any medical or dental treatment necessary to safeguard the life and health of the Minor."

Jessica was initially placed with her paternal grandparents while a home study was completed on Scott and his new wife, Kim. All visitations with Jessica were to be supervised.

Subsequently, Judge Hayes issued an order dated July 7, 1995, placing Jessica with Scott under an order of protection. Karen's visitation with Jessica was to remain supervised.

Though the adjudication hearing was originally set for September 21, 1995, the hearing was not held until February 6, 1996. All of the witnesses who testified at the temporary custody hearing testified again at this hearing. In addition, however, Karen presented three witnesses in her defense: Sandy Rabenda, who had been Karen's next-door neighbor for three years; Marie Amejia, Jessica's baby-

sitter from November 1994 until June 1995; and Peggy Koehl, Jessica's godmother. All of these witnesses testified that they had seen Jessica regularly and never saw any bruises or evidence of abuse. They testified that Karen was a good mother, though she believed in disciplining with the wooden spoon she called "the rod." Everyone described Karen as patient. Karen never raised her voice or shouted at Jessica in anger. When Jessica misbehaved, Karen took Jessica into the bathroom to discipline her.

Amejia said Karen had taken Jessica into the bathroom at her home on a few occasions. She could overhear Karen explaining to Jessica what was wrong with her behavior and then heard Karen administer "two to three taps on the bottom." Amejia said that Jessica always came out of the bathroom happy, not upset.

Amejia also testified about the bruise Jessica had in December 1994. Amejia baby-sat for Jessica and didn't notice the bruise. When Karen picked Jessica up that day she told Amejia about the bruise she left on Jessica. The next day Amejia saw the bruise. Amejia described it as "very small," a 1- to 1½-inch bruise on the center of Jessica's buttocks. She said Jessica was not uncomfortable or bothered by the bruise.

Karen also testified at the adjudication hearing. She said she had been horrified when she discovered the bruise she left on Jessica that one time in December 1994. She immediately told both the baby-sitter and Scott. Scott, Karen said, told her he knew she was a good mother and "not to worry." He even gave her a small kiss on the cheek. Scott had been unconcerned about the bruise in December 1994.

On June 10, 1995, however, Scott brought Jessica home late from a visitation. When Karen complained, Scott's wife, Kim, became angry and stormed off. Scott also got angry. He told Karen never to yell at him in front of his wife. Then Scott threatened Karen, telling her he could have her arrested. Two days later Karen came under investigation for child abuse.

After hearing the evidence and the arguments of counsel, the court (Judge Preston) made the following determination:

> "[A]nd this is a difficult case because it doesn't fall within any of the reported cases ***. The testimony was that, in virtually all respects other than this corporal punishment, that the home seemed to be appropriate in that Jessica was well-clothed, well-fed, well-cared for; but the issue of the corporal punishment which brought this case into the system remains, and I'm simply not indicating that I'm not considering that corporal punishment seriously because I certainly am, but I'm going to not make a finding

of neglect based on injurious environment. The allegation of physical abuse and substantial risk of physical injury—all these are closely tied in with the corporal punishment. I'm not going to make a finding that there was physical abuse because I don't think that the corporal punishment the mother used on Jessica rose to that level, nor do I think that there's a substantial risk of physical injury to this minor, notwithstanding that she did sustain a bruise on the one occasion.

That leaves us with the allegation of excessive corporal punishment which is indeed the most difficult in this case because if we were to look at corporal punishment as in severity from a continuum of (1) to (100), if we were to make an assumption just for the sake of this discussion that anything above (65) on that continuum was considered to be excessive and anything—(65) was considered to be within the realm of what is permitted pursuant to Illinois law, and the law of the United States has been expressed in a number of decisions including the INGRAHAM decision and others, *** it's clear this case doesn't fall at the higher level of that case ***.

What is added in this case of that instance of December of 1994 is the prior and successive uses of paddling with that spoon on many occasions. Some of the testimony was as often as twice a week. Other testimony was whenever Jessica misbehaved by lying or acting foolish or doing something wrong. Did that make that isolated instance along with these other instances where bruises were not left, where there was no last [sic] physical effect of that corporal punishment? Does that nonetheless make this allegation rise to the level of what is unreasonable in light of Illinois law? And, I think it does.

I believe that while this is certainly in no respect the most heinous of the circumstances that could come before this Court and that, God, it's not the most heinous but it does, I'll admit, just barely—but it does rise to the level of excessive corporal punishment because of the frequency of the reliance on using a paddle; and I'm not emphasizing the paddle in this decision—it's not the paddle that is what I find offensive alone; it could be—the paddle itself is not terribly offensive. It's not very large. It's not very heavy, but the corporal punishment is used with such frequency for the infractions.

* * *

And I'm not going to get into teachings of the church because the church doesn't tell a parent to use excessive corporal punishment; *and that somewhat was; and again so our record is clear, just barely used in this case.*" (Emphasis added.)

The case was held over until April 19, 1996, for the dispositional

hearing. Testimony was taken on April 19, 1996, and again on May 2, 1996. The court learned of Karen's successful completion of the STEP parenting classes. The court also was given information about the interaction of Karen and Jessica during supervised visitation. The court was provided psychological evaluations, as well as reports from various counselors involved with both Karen and Jessica.

After considering all the evidence, the court issued its decision on August 23, 1996, saying:

> "To make a long story short, I find that first: That the minor, Jessica P., is adjudged a ward of the court. Secondly, I find that both mother, Karen P., and the father, Scott P., are both fit, able, and willing to care for, protect, train and discipline this minor. I'm going to dwell on that for just a moment here so that the record is very clear on what this Court's finding is.
>
> Based on all the testimony that I heard, all of the documentary evidence that had been admitted into evidence, and considering arguments of counsel, that not only do I find the parents, Karen and Scott, to be fit, willing and able; but I also find their respective spouses to be perfectly appropriate caretakers for Jessica, but I'm not Solomon; and I don't have some of the powers that he sought to dispense when he suggested a child be cut in half. I have to make a dispositional finding that will be appropriate for this child, and the law tells me that I must at this point of our proceedings consider what is in Jessica's best interests and nothing else. And, in that regard since Jessica has been doing well living at home with her father this past year, I think that it would be in her best interests to remain in her father's custody, and that will be what this Court orders—that Jessica remain in the custody of her father under an Order of Protection."

The court went on to explain that the order of protection should contain detailed orders regarding visitation, to include "liberal contact" between Karen and Jessica, "periods of time—summer vacations and other vacations—when mother will have custody of Jessica, all visitation being unsupervised *** and without restriction."

After the dispositional order was issued, Karen filed her first notice of appeal. In this appeal Karen sought review of the trial court's findings at the temporary custody hearing, the adjudication hearing, and the dispositional hearing.

Subsequently, despite the court's order with regard to visitation, DCFS unilaterally decided to restrict visitation, allowing Karen only supervised visits with Jessica. This decision was based on the recommendation of Jessica's therapist, Debra Warren, due to unverified comments Jessica made about fears she had of Karen's church.

A hearing was held November 19, 1996, due to the change in

visitation. The court ordered DCFS to resume unsupervised visitations in accord with its initial order. The court also signed an order, however, allowing DCFS to restrict visitation in the future without court intervention.

Thereafter, on December 18, 1996, DCFS suspended all visitation between Karen and Jessica. DCFS said Karen had behaved "inappropriately" because she went to the office of Jessica's pediatrician to be present for Jessica's appointment concerning a possible urinary or bladder problem.

Karen filed a motion to cancel DCFS's suspension of her visitation and to rescind DCFS's unfettered discretion to restrict visitation in the future. At a hearing on December 20, 1996, the court denied the motion and announced its intention to transfer the case to domestic relations court. It never was.

At a subsequent hearing on January 15, 1997, the court again refused to consider the motion to restore visitation and suspend DCFS's right to unilaterally restrict visitation. Karen's second notice of appeal is from this order.

DECISION

■ The first step in our review is to note the standard by which we must judge the trial court's decisions. The trial court is vested with "wide discretion" when making a determination as to abuse and neglect. *In re Ashley F.*, 265 Ill. App. 3d 419, 425, 638 N.E.2d 368 (1994). In fact, courts have held the discretion afforded the trial court is even greater than the typical "manifest weight" standard. *In re D.L.*, 226 Ill. App. 3d 177, 185, 589 N.E.2d 680 (1992). This higher degree of deference, the courts say, is justified "by the delicacy and difficulty of child custody cases." *In re D.L.*, 226 Ill. App. 3d at 185, citing *In re Stilley*, 66 Ill. 2d 515, 520, 363 N.E.2d 820 (1977). Consequently, a court's decision should not be disturbed unless it is manifestly unjust or palpably against the weight of the evidence. *In re Stilley*, 66 Ill. 2d at 520; *In re D.L.*, 226 Ill. App. 3d at 185. The State must prove its allegations of abuse and neglect by a preponderance of the evidence. *In re Enis*, 121 Ill. 2d 124, 520 N.E.2d 362 (1988).

Though the manifest weight standard appears daunting, and certainly the vast majority of trial court determinations on abuse and neglect are affirmed, the standard should not be impossible to meet or there would be no purpose for review.

In this case the petition for adjudication of wardship alleged Jessica was neglected on the basis of injurious environment and physically abused because of injury and excessive corporal punishment. All

of the charges were based on allegations that Jessica had "sustained cuts, welts, and bruises on her buttocks and legs as a result of being beaten by her mother."

When ruling on this petition at the February 6, 1996, adjudicatory hearing, the court found: (1) Karen's home was appropriate and Jessica was well clothed, well fed, and well cared for in Karen's home; (2) Jessica was not neglected due to injurious environment; (3) the type of corporal punishment Karen employed never rose to the level of physical abuse; (4) there is no substantial risk of physical injury to Jessica; (5) the wooden spoon used by Karen was not heinous or "terribly offensive"; (6) there was only one instance when Jessica was bruised as a result of being disciplined with the wooden spoon and this one instance did not rise to the level of excessive corporal punishment; and (7) the one incident of a bruise, coupled with the frequency with which Karen resorted to the use of the wooden spoon for discipline, "just barely" amounted to excessive corporal punishment.

We accept and agree with the trial judge's factual findings. We believe, however, the trial judge committed manifest error when he drew the legal conclusion that the facts amounted to excessive corporal punishment within the meaning of the Juvenile Court Act.

When deciding the issue of "excessiveness," the court invented a mathematical equation or "continuum," suggesting that corporal punishment could be weighed against a theoretical scale of seriousness (*i.e.*, a scale from 1 to 100, with 65 being the starting point for excessive corporal punishment). Though the judge found the corporal punishment employed here "doesn't fall at the higher level," the court still ruled that Jessica was abused. The court was careful, however, to specify that its finding of abuse was due to excessive corporal punishment and was not a finding of "physical abuse." The court specifically corrected the order to note that the abuse was not "physical" abuse.

Once the trial court found Jessica to have been abused by her mother, Jessica was not returned to Karen's custody pending the dispositional hearing. Jessica remained a ward of the court, in the custody of DCFS, and continued to reside with her father. Karen was allowed only supervised visitation with her daughter under rather stringent regulation.

Because the court found no basis other than excessive corporal punishment for holding Jessica was abused or neglected, we limit our review to that determination. We consider whether the facts of this case fall within the meaning of "excessive corporal punishment" as that term is used within the Juvenile Court Act. If it does not, there is no reason to consider the best interests of the child.

■ When defining an abused minor, the Act states:

"(2) Those who are abused include any minor under 18 years of age whose parent or immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same home as the minor, or a paramour of the minor's parent:

(i) inflicts, causes to be inflicted, or allows to be inflicted upon such minor physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function;

(ii) creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function;

(iii) commits or allows to be committed any sex offense against such minor, as such sex offenses are defined in the Criminal Code of 1961, as amended, and extending those definitions of sex offenses to include minors under 18 years of age;

(iv) commits or allows to be committed an act or acts of torture upon such minor; or

(v) inflicts excessive corporal punishment." 705 ILCS 405/2—3(2) (West 1994).

■ The term "excessive corporal punishment" is not defined in the Act. Perhaps this is because cases involving the adjudication of abuse, neglect, and wardship are *sui generis*; that is, each case must be decided on its own distinct set of facts and circumstances (*In re Edricka C.*, 276 Ill. App. 3d 18, 25, 657 N.E.2d 78 (1995)) and, given the varying circumstances in these types of cases, courts must have "broad discretion to reach a just determination" (*In re F.W.*, 261 Ill. App. 3d 894, 897, 634 N.E.2d 1123 (1994)).

It is clear that a parent has the "right" to corporally discipline his or her child, a right derived from our constitutional right to privacy. See *In re F.W.*, 261 Ill. App. 3d at 898. But this right, like any other, must be exercised in a "reasonable" manner. *In re F.W.*, 261 Ill. App. 3d at 898; *In re L.M.*, 189 Ill. App. 3d 392, 545 N.E.2d 319 (1989).

A number of courts have been faced with the dilemma of determining what constitutes "excessive" or "unreasonable" corporal punishment. A survey of these cases provides some insight.

In *In re F.W.* the court found it was neglect when the mother hit her 13-year-old daughter using a 24-inch-long board with two metal brackets on it. The mother said she hit her daughter because she

wanted her to "shut up." The "discipline" resulted in a knot on the girl's arm and gashes on her leg. The 13-year-old and her sister also reported being physically disciplined almost daily with a variety of objects, including ball bats, broomsticks, extension cords, and ropes. When questioned, the mother noted she carried scars from being punished by her own parents and didn't feel she had been abused.

In assessing the matter the *F.W.* court said the degree of physical injury stemming from the discipline was not the "exclusive or determinative factor in evaluating the reasonableness of a parent's conduct." Other factors considered by the court were: (1) the likelihood of future, more serious injury; (2) the psychological effects on the child; and (3) the circumstances surrounding the discipline, including the parent's demeanor, *i.e.*, whether the parent was calm or "lashing out" in anger.

In *In re D.L.W.*, 226 Ill. App. 3d 805, 589 N.E.2d 970 (1992), the father of two sons, ages 5 and 10, was found unfit and his parental rights terminated because, the court said, he could not differentiate between corporal punishment and physical abuse. On different occasions, the father punched the older son in the face with his fist, grabbed him by the throat and kneed him in the groin, spanked his bare buttocks with a 1½-foot-long board while saying, "I don't care if I have to beat you to death, you are going to learn not to wet the bed any longer," and hit him with a wooden spoon until it broke in pieces. 226 Ill. App. 3d at 809. The father believed his children should fear him.

In *People v. Sambo*, 197 Ill. App. 3d 574 (1990), the court found it was not reasonable discipline for the parents to hit their daughter with a plastic baseball bat, kick her, throw liquor in her face, and pull her hair.

In *In re L.M.*, 189 Ill. App. 3d 392, 545 N.E.2d 319 (1989), the mother of two sons, ages 7 and 9, was found to have abused them as a result of excessive corporal punishment. The children were left unattended for more than a day, were dirty, and had colds. When the father found them, he discovered the younger boy had 5 "whip marks" on his back. The marks were between 6 and 10 inches long and were "pink-fleshy lines after the scabs that had initially formed had fallen off." 189 Ill. App. 3d at 395. The child reported that he had been beaten with a belt and stick for playing ball in the house.

In *In re Weber*, 181 Ill. App. 3d 702, 537 N.E.2d 428 (1989), a two-year-old boy was found to have been physically abused by his mother because he repeatedly was found to have bruises. On one occasion he had bruises on his head, arms, buttocks, and back. Another time he was found to have 30 to 40 small bruises under his diaper. A

doctor reported that the bruises extended from the lower neck to the buttocks and appeared to be thin, parallel lines as if caused by a small stick.

In *People v. Tomlianovich*, 161 Ill. App. 3d 241, 514 N.E.2d 203 (1987), a mother was convicted of cruelty to her children. The court said a parent's disciplinary authority had to be exercised within the bounds of reason and humanity. These bounds were passed, said the court, when it was shown that the mother hit her 11-year-old son with a paddle, causing bruising to the child's buttocks. A doctor testified he had never seen such a severe condition. The bruises were to the point of hematoma and were visible until the third visit to the doctor's office, 16 days after the incident.

In *In re D.M.C.*, 107 Ill. App. 3d 902, 902, 438 N.E.2d 254 (1982), the court found it to be excessive corporal punishment for the parents of a nine-year-old boy suffering from hyperactivity and learning disabilities to discipline him with a leather belt. On one particular instance, when the boy brought his father's cowboy hat to school without permission, the child received as many as 100 strokes to his bare buttocks, resulting in the entire area of the buttocks and thighs being "solidly bruised."

In *People v. Swanson*, 84 Ill. App. 3d 245, 405 N.E.2d 483 (1980), the mother's paramour was found guilty of battery and reckless conduct because he disciplined her five-year-old son using a belt, leaving a number of marks on the child's back and chest.

■ We are guided by the Illinois Administrative Rules, which are relied on by DCFS. Section 300 provides a list of various allegations which could support a finding of abuse or neglect. See 89 Ill. Adm. Code § 300 app. B (1997). Allegation No. 11/61, entitled "Cuts, Bruises, and Welts," notes that "not every cut, bruise, or welt constitutes an allegation of harm." The Illinois Administrative Code suggests considering such factors as the child's age, the severity of the injury, the location of the injury, whether an instrument was used, and the pattern and chronicity of similar incidents of harm to the child. Other factors to be considered are the child's medical condition and whether the child suffers from behavioral, mental, or emotional problems, developmental disabilities or physical handicaps. The parent's history of reports of abuse or neglect may also be significant.

■ Here, Karen readily admitted to disciplining Jessica with a wooden spoon and said she began using this form of discipline when Jessica was 2½ years old. However, the frequency of these spankings and the number of blows administered never were established with any exactitude. Karen spanked Jessica on the buttocks, over her clothes. As the court determined, there was only one instance when

bruising occurred on Jessica's buttocks—the isolated occasion in December 1994. Karen was so horrified when this occurred that she felt compelled to "confess" to her ex-husband and baby-sitter. Neither of them was very concerned at the time. The father expressed no concern for six months. The babysitter said the bruise was "very small," about 1 to 1½ inches in size, and when the bruise was visible Jessica was not in any pain.

It is significant that the baby-sitter witnessed the mother's form of discipline on a number of occasions. She said Karen never lashed out at Jessica in anger. Karen was generally calm and patient. More importantly, Jessica appeared happy and unaffected after being disciplined.

We agree with the court's comments in *In re F.W.*, 261 Ill. App. 3d 894, 902, 634 N.E.2d 1123 (1994): It is not a court's function to determine whether "parents measure up to an ideal, but to determine whether the child's welfare has been compromised."

We agree, too, that corporal punishment as a method of discipline is a "controversial issue" and the mere fact that an object is employed to conduct the discipline raises immediate concerns. But the use of an object, especially when the court finds the object was not "terribly offensive" or "heinous," should not blind a court to the many other factors which should and must be considered when weighing the evidence to determine the "reasonableness" of the discipline. We must take care not to create a legal standard from our personal notions of how best to discipline a child.

Section 2—3 of the Juvenile Court Act places "excessive corporal punishment" within the category of "abused" minor, a category which contains much more severe forms of injury, such as "death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function" and "torture." 705 ILCS 405/2—3(2) (West 1994).

Our review of Illinois decisions discloses no case where facts close to those found by this trial court were enough to allow the State to wrest custody of a child from her mother. We find no precedential support for the proposition that the mere frequency of relatively mild, nonbruising contacts by an object other than a hand rises to the level of "excessive corporal punishment" as that term is used in the Juvenile Court Act.

We believe our conclusion is consistent with the letter and spirit of the Juvenile Court Act. Making a child a ward of the court is a serious thing to do. When that child is being well cared for by fit and able parents, when the child's environment is not injurious, when the child is neither physically nor psychologically abused or neglected,

and when there is no substantial risk of physical injury to the child, courts should exercise grave prudence before allowing the State to violate the privacy our law promises to the family.

We cannot draw a firm line between excessive and nonexcessive corporal punishment. Nor do we wish to give license to parents who would use the force of physical objects to discipline their children. We simply hold the unusual circumstances in this case do not "barely" cross the line to excessive corporal punishment. They do not cross the line at all. The trial court's finding to the contrary was against the manifest weight of the evidence.

We can understand the trial court's reluctance to implicitly give approval to Karen's use of the wooden spoon, but we believe the trial court exceeded its authority and unjustifiably intruded on the respondent's privacy rights and her fundamental liberty interest in the care and custody of her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 71 L. Ed. 2d 599, 606, 102 S. Ct. 1388, 1394-95 (1982).

While the State contends the evidence proves Karen's conduct caused psychological damage to Jessica, the trial judge made no such finding. We take his silence on the matter, making no comment on the "oar" incident, to be a rejection of the State's claim. Further, we see no need to examine the record for possible psychological harm since we end our inquiry with the conclusion that there was no excessive corporal punishment in this case.

Because we decide there was no excessive corporal punishment here, there is no need to discuss other, troublesome matters raised by Karen in this appeal—including DCFS's exercise of power to modify a judge's visitation order without prompt judicial review, the failure of the trial judge at the probable cause hearing to make written findings in support of his ruling, and the trial court's failure to document DCFS's efforts, if there were any, to eliminate or prevent the necessity for removal of the child in the first place.

Because we conclude Karen did not violate section 2—3 (2)(v), all orders entered at and after the adjudicatory hearing are vacated. We remand this cause to the juvenile court for proceedings consistent with this opinion. We anticipate the trial court will eliminate any roadblocks to the return of Jessica to her mother's custody.

Reversed and remanded.

McNAMARA and SOUTH, JJ., concur.