*In re* S.M., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Wanda McClendon, Respondent-Appellant).

Fourth District No. 4—99—0613

Opinion filed January 7, 2000.

William A. Pryor, of Pryor Law Offices, of Springfield, for appellant.

John P. Schmidt, State's Attorney, of Springfield (Norbert J. Goetten, Robert J. Biderman, and Kathy Shepard, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

Respondent mother, Wanda McClendon, appeals from the orders of the circuit court of Sangamon County adjudicating her daughter, S.M. (born September 16, 1985), a neglected minor, making the child a ward of the court, and placing her in the custody and guardianship of

the Illinois Department of Children and Family Services (DCFS). On appeal, respondent mother argues that the trial court's finding of neglect was against the manifest weight of the evidence. We reverse.

On March 23, 1999, the State filed a petition for adjudication of wardship alleging that S.M. was (1) neglected because her environment was injurious to her welfare and (2) abused because of infliction of excessive corporal punishment. 705 ILCS 405/2—3(1)(b), (2)(v) (West Supp. 1997). On first appearance, the court ordered the family to cooperate with counseling; S.M. to obey household rules, not run away from home, and attend school each day it was in session; and respondent mother and S.M.'s stepfather, Aaron McClendon, to not use corporal punishment on the minor. At this first hearing, the prosecutor observed:

"[T]here's some alleged reports of her drinking alcohol at this time. I have seen [S.M.] smirk since she has been in here. I thought attention would catch her eye, but it hasn't. I don't know if Your Honor has emphasized if she is convicted on the contempt and continues the behavior, she can spend six months in detention, not just a weekend. We are trying to get her attention now so she doesn't further her behavior and end up in the Department of Corrections. I'd like you to inform the minor that this behavior needs to stop."

On April 12, 1999, a petition for adjudication of criminal contempt was filed, alleging that S.M. ran away from home. A warrant for S.M. was issued that date. On April 22, 1999, after S.M. was apprehended, the trial court continued its earlier order in effect, and the cause was set for a combined contempt and adjudicatory hearing on May 13, 1999. On May 13, 1999, the trial court found S.M. in contempt and ordered that she serve 30 days' detention, but the disposition was stayed on the conditions that S.M. remain at home, obey household rules and court orders, and cooperate with DCFS. The adjudicatory hearing was continued to June 24, 1998.

S.M. was not present at the adjudicatory hearing. The record indicates that she was in a "runaway status." Mary Boltz, a DCFS investigator, testified that on March 2, 1999, S.M. reported to a DCFS hotline that her stepfather hit her with a belt and respondent mother did not intervene. S.M. informed Boltz that, after a friend reported to S.M.'s parents that S.M. had sex with a cousin, her stepfather hit her with a belt for about 30 minutes. Boltz observed bruising, linear marks, on the minor's arms and upper thighs. There were five or six marks on each arm from the shoulder to the hand and three or four marks on each thigh. They ranged in size from one inch to three to five inches long. No medical evidence was presented with respect to

the belt discipline. The stepfather admitted striking S.M. with a belt, but denied that it was for the length of time S.M. reported. Boltz interviewed another gentleman in the house who witnessed the sexual activity and found him credible. Boltz testified that the parents described S.M. as "out of control": she had not been following house rules, behavior problems had existed for about two years, that all alternative forms of discipline except corporal punishment had been exhausted. Asked where S.M. was, Boltz answered, "she's on runaway status." At the time of the adjudicatory hearing, S.M. had been gone for about 10 days. In the past, S.M. had run away from home, had not come home at night, and was running the streets.

Respondent mother admitted that S.M. was disciplined by the stepfather and she did not attempt to intervene to stop it. After her husband's nephew reported catching S.M. and her cousin having sex in an upstairs room and later in a bathroom, respondent mother confronted S.M., told her it was wrong, and said that having sex with a cousin was "too close of blood" and that she had not raised S.M. to do "stuff" like that. S.M. did not say anything. Upon being questioned about S.M.'s conduct, respondent mother said "[S.M.] needed a whooping, discipline for what she did, because she knew what she did was wrong." The "whooping" was administered, respondent mother was present, it did not last 30 minutes, and S.M. was bruised but not bleeding. Respondent mother did not know how many times S.M. was struck. Disciplinary problems had been going on for about one year. S.M. refused to go to school, stay home, obey curfew, or help around the house. In addition to corporal punishment, the parents tried denying her privileges, confining her to her room, and grounding her to keep her away from her friends. These methods of discipline did not work. S.M. sneaked out of the house. On more than 10 occasions, S.M. did not return home and stayed out all night. Respondent mother was concerned and frightened by this behavior. Respondent mother told S.M. she disapproved of S.M.'s associates. The corporal punishment was a last resort. The record suggests that, subsequent to the order of the court denying the mother and stepfather the use of corporal punishment, S.M. found further reason to not go to school and to be a runaway and to refuse to be subject to any discipline of respondent mother and the stepfather. Respondent mother did not know what she would do if S.M.'s behavior were to continue after the court returned her home.

On this evidence, the trial court found S.M. to be a neglected minor, placed her in the custody and guardianship of DCFS pending further proceedings, and set a dispositional hearing for July 22, 1999. At the July 14, 1999, review hearing, the trial court ordered S.M. to

serve 14 days of the 30 days previously imposed, with credit for two days served, and the remaining 16 days were stayed to allow S.M. to attend preplacement visits or for placement by DCFS.

The DCFS report filed July 19, 1999, indicated that on the evening of March 31, 1999, after the first appearance in court, S.M. ran away. On April 6, 1999, it was reported to a DCFS worker that S.M. had been seen a few days earlier at a party where liquor was served to minors. On April 12, 1999, S.M. returned home for one night and then ran again the next day. S.M. had been expelled from Washington Middle School and sent to an alternative school. A maternal aunt came forward to assist in caring for S.M., but called a few days later to say S.M. had stolen money from her purse and she could no longer care for S.M. The family had been referred to counseling.

At the dispositional hearing, respondent mother had no problem with the DCFS recommendations, but she moved to vacate the finding at the adjudicatory hearing because she and her husband did not want to be branded abusive and neglectful. The trial judge pointed out that, if he did that, he could not enter the dispositional order. S.M. was made a ward of the court and placed in the custody and guardianship of DCFS.

■ The proceedings in this case are civil in nature, and the finding of neglect need only be supported by a preponderance of the evidence. See *In re A.P.*, 179 Ill. 2d 184, 204, 688 N.E.2d 642, 652 (1997); 705 ILCS 405/2—18(1) (West Supp. 1997). The trial court's finding of neglect will not be overturned on appeal unless it is against the manifest weight of the evidence. *A.P.*, 179 Ill. 2d at 204, 688 N.E.2d at 652.

The parties cite *In re L.M.*, 189 Ill. App. 3d 392, 398-99, 545 N.E.2d 319, 323-24 (1989), to support their positions. In *L.M.*, the facts were substantially different. Medical testimony was presented concerning the bruise marks. Evidence showed that the respondent mother acted out aggressively and did not realize she was doing so. She expressed no remorse and refused to admit any abuse. The appellate court found that the whipping "was vicious and unreasonable and exceeded the bounds of proper parental force." *L.M.*, 189 Ill. App. 3d at 398, 545 N.E.2d at 324.

The arguments of both parties to this appeal focus on whether the corporal punishment was deserved or necessary to bring S.M. into line. However, the corporal punishment was only one factor to be considered. S.M.'s environment was injurious to her welfare even without the corporal punishment. This 13-year-old girl was disobeying household rules, staying out at night, associating with persons likely to get her into trouble, and having problems at school. Those circumstances had been ongoing for about one year. Respondent mother was

obviously frustrated by S.M.'s behavior and corporal punishment was a last resort. In this environment, S.M. even flaunted the authority of the court. She needed a change in environment to prevent further escalation of the situation at home and to get back on the right track.

 █ In considering whether corporal punishment is excessive, factors worthy of consideration include whether (1) an injury occurred, (2) the punishment was imposed for no reason, (3) the punishment was excessive in the light of the circumstances, and (4) any medical or expert testimony was presented. The record is devoid of any evidence that the belt was used in a vicious manner or for other than disciplinary reasons. Although excessive corporal punishment is to be condemned, not condoned, the evidence in this case does not show excessive corporal punishment. There is a difference between vengeance corporal punishment and concerned, caring corporal punishment. The actions and conduct of S.M., along with her best interests, clearly required strong discipline. Corporal punishment given in a concerned, caring manner is not abuse and is not neglect. The respondent mother and stepfather participated in the hearings. It is clear that they wanted what was best for S.M. The stepfather succinctly stated the problem at the first hearing in saying:

> "She has no remorse or nothing for the—nothing she does, for nothing she does at school, nothing she does at home when she runs away. I mean, I'm not talking about the corporal punishment of it. If you talk to her, you tell her she's doing wrong, whatever, she has no remorse for anything she does, she thinks everything's a joke, everything's fun and games, she thinks there's no consequences for her actions."

The finding of neglect was against the manifest weight of the evidence.

It is clear from the record that corporal punishment was a last resort. S.M. should be a ward of the court but not for the reasons suggested by this evidence. She may very well be a juvenile delinquent (705 ILCS 405/5—101 through 5—915 (West 1998)) or a minor requiring authoritative intervention (705 ILCS 405/3—1 through 3—33 (West 1998)). However, on this evidence, she is not a neglected minor.

The judgment of the circuit court of Sangamon County is reversed.

Reversed.

COOK, P.J., and KNECHT, J., concur.