# Illinois Official Reports

## Appellate Court

---

### *People v. Royster*, 2018 IL App (3d) 160306

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MITCHELL JAMES ROYSTER, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-16-0306 |
| Filed<br>Rehearing denied | May 17, 2018<br>June 12, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 15-CF-515; the Hon. Kevin W. Lyons, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Peter A. Carusona, and James Wozniak, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Jerry Brady, State's Attorney, of Peoria (Patrick Delfino, David J. Robinson, and Gary F. Gnidovec, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE O'BRIEN delivered the judgment of the court, with opinion.<br>Justices Lytton and Wright concurred in the judgment and opinion. |

**OPINION**

¶ 1       Defendant, Mitchell James Royster, appeals his aggravated battery conviction, arguing that a jury instruction given misstated the law. We affirm.

¶ 2                                                    FACTS

¶ 3       Defendant was charged with aggravated battery (720 ILCS 5/12-3.05(b)(2) (West 2014)) and domestic battery (*id.* § 12-3.2(a)(1)). The case proceeded to a jury trial. Ashley C. testified that A.C.M. was her daughter and, on July 31, 2015, A.C.M. was two years old. Defendant was Ashley's fiancé. On July 31, Ashley had a doctor's appointment to which defendant and A.C.M. accompanied her. A.C.M.'s car seat was located behind the driver's seat. Ashley testified that they all went into the examination room. A.C.M. was given a latex glove, and Ashley blew it up like a balloon for her to play with. A.C.M. kept putting the glove in her mouth, and Ashley, defendant, and the nurse kept telling her to stop. When A.C.M. would not stop, they took the glove away from her and threw it in the garbage can. A.C.M. then "started throwing a fit in the exam room." "She started throwing herself backwards onto the floor, kicking and screaming and hitting her head on the floor and pulling at her hair." When Ashley could not calm A.C.M. down, defendant took her out to their vehicle. Ashley saw A.C.M. later that day and did not notice any black eyes, bruises, or a cut on her lip. She stated that the photographs accurately portrayed what A.C.M. looked like that day. Defendant had Ashley's permission to "spank [A.C.M.'s] bottom" or "pop her on her mouth" at any time when A.C.M. was misbehaving.

¶ 4       Lori Tracy testified that she was a medical records supervisor at Heartland Community Health Clinic. At around 11:30 a.m. on July 31, she was leaving the clinic for a smoke break with Misty Garcia. Before they reached the doors, they saw defendant carrying a screaming A.C.M. over his shoulder and asking where to exit the building. A lady directed defendant to the door, and Tracy and Garcia followed him. Tracy stated, "As soon as he walked out the *** door and we were not even two feet behind him, he smacks her on the leg, open handed at least three times really hard and yelled at her to shut the fuck up." The slaps were on A.C.M.'s bare leg and were "pretty hard." Tracy said they observed defendant take A.C.M. to a vehicle and "thr[o]w [A.C.M.] in the backseat." She saw defendant "raise up his fist in the air" three times "[t]owards the child." Defendant then walked around the vehicle, opened the vehicle door again, and "struck A.C.M. again three more times with a fist." Tracy said:

> "When he got done with that one, he slammed the car door, proceeded to walk around again. By the time he got to the trunk, he slammed the phone on the trunk of the car because he was so pissed—you can see he was mad—proceeded to open the car door again. By then we couldn't stand it anymore. We took off running [toward the vehicle]. By the time I got to the car, he already hit her again another three times."

¶ 5       Tracy told defendant she was going to take A.C.M. inside. Defendant tried to prevent her from doing so and said, "by law I can hit her up to three times." Tracy told Garcia to call the police. When Tracy approached A.C.M., "[s]he was crying and her face was all red. Her lip was bleeding and she was just crying." Tracy took A.C.M. into the clinic until the police arrived. Tracy said that once A.C.M. started to calm down, she noticed that A.C.M.'s "lip was busted. She had red lines where it was split apart. *** Her face was all red and her—underneath her eyes were starting to turn more blue and puffy." As time progressed,

- 2 -

Tracy noticed that both of A.C.M.'s eyes were puffy and blue. She also had a handprint on her leg. Garcia corroborated Tracy's testimony.

¶ 6        Dina Durst stated that she was sitting in her vehicle in the parking lot of the clinic at the time of the incident. She saw defendant carrying A.C.M. out of the clinic. Defendant "looked agitated with [A.C.M.]" It looked like defendant was yelling at her. Durst saw defendant "throw[ ] [A.C.M.] in her car seat." She saw defendant's arm "swinging" in "an upwards movement sideways." Defendant then slammed the door, walked around the vehicle, opened the door, and did it again. After it had happened twice, Durst exited her vehicle and started walking over toward defendant's vehicle when defendant opened the door and did it a third time. She saw two other ladies walk over and take A.C.M. into the clinic.

¶ 7        Defendant testified that when A.C.M. started to "throw[ ] a fit," he took her out to their vehicle. It was difficult placing A.C.M. in her car seat because she was thrashing around and flailing her arms and legs. He then pointed his finger at her and told her "that if she did not stop throwing her fit that [he] was going to pop her in the mouth." When she did not stop, he "popped her in the mouth with [his] left hand with minimal force, just enough to get her attention." He then shut the door and walked around to the passenger side of the vehicle to retrieve his cell phone and cigarettes. As A.C.M. was still "throwing a fit," he again "popped her in the mouth with [his] open hand [with] minimal force." He again closed the door and walked around the vehicle. He then opened the door to try to talk to A.C.M. when Tracy approached the vehicle and said she was taking A.C.M. When defendant refused, Tracy forcefully took A.C.M. out of the vehicle and into the clinic. Defendant followed her. Defendant said he never hit A.C.M. with his fist. He also did not throw A.C.M. into the vehicle.

¶ 8        A jury instruction conference was conducted. The State proposed three instructions that included references to defendant's affirmative defense of corporal punishment based on *People v. Green*, 2011 IL App (2d) 091123. The three instructions provided, in relevant part:

     (1) "To sustain the charge of Aggravated Battery," the State had to prove, *inter alia*, "[t]hat the force used was not reasonable or necessary,"

     (2) "To sustain the charge of Domestic Battery," the State had to prove, *inter alia*, "[t]hat the force used was not reasonable or necessary," and

     (3) "A parent or a person lawfully acting in a parent's place is justified in using corporal punishment as discipline so long as it is necessary and reasonable."

Defense counsel agreed to the instructions.

¶ 9        During jury deliberations, the jury sent out a handwritten note stating, "Does the phrase 'force used was not reasonable or necessary' does this mean both conditions need to be met or just one condition?" (Emphases omitted.) The court responded, "The jury should rely on the stand alone instruction which says: 'A parent or a person lawfully acting in a parent's place is justified in using corporal punishment so long as it is necessary and reasonable.' " The jury found defendant guilty. Defendant was sentenced to 30 months' probation and 40 days in jail.

¶ 10                                            ANALYSIS

¶ 11        On appeal, defendant argues that the jury instructions regarding parental discipline misstated the law and were conflicting. Defendant admits that he did not preserve this issue for appeal. However, he asks us to find that his trial counsel was ineffective for failing to object to

the jury instructions. We hold that because the instructions were neither misstatements of law nor conflicting, trial counsel was not deficient for agreeing to the instructions.[1]

¶ 12    Defendant first argues that the jury instructions misstated the law with regard to when a parent is justified in using corporal punishment. Specifically, defendant contends that Illinois law only requires that parental discipline be reasonable, not necessary. Our review of the case law has found numerous cases in which the "necessary and reasonable" language has been used by courts when stating the rule of law of parental discipline. See *People v. Parrott*, 2017 IL App (3d) 150545, ¶ 23 (" 'A parent is privileged to apply such reasonable force or to impose such reasonable confinement upon his child as he reasonably believes to be necessary for its proper control, training, or education.' " (quoting the Restatement (Second) of Torts § 147(1) (1965))); *Green*, 2011 IL App (2d) 091123, ¶ 16 (stating that parents may take reasonable steps to discipline their children when necessary); *In re F.W.*, 261 Ill. App. 3d 894, 901 (1994) (same); *People v. Sambo*, 197 Ill. App. 3d 574, 587 (1990) (same). Further, the court in *People v. Roberts*, 351 Ill. App. 3d 684, 687 (2004), specifically found that a jury instruction which stated, " 'A parent is legally justified in using reasonable force when necessary as part of reasonable discipline of a child' " was "an accurate, simple, brief, impartial, and nonargumentative statement of the law" (*id.* at 688). Considering the plethora of case law supporting the language used in the jury instructions, we cannot say that the jury instructions misstated the law.

¶ 13    In coming to this conclusion, we acknowledge that defendant has cited authority that does not expressly analyze the "necessary" element. See *In re J.P.*, 294 Ill. App. 3d 991 (1998); *In re S.M.*, 309 Ill. App. 3d 702 (2000); *People v. DeCaro*, 17 Ill. App. 3d 553 (1974); *Parrott*, 2017 IL App (3d) 150545. Upon review, we do not interpret these cases to stand for the proposition that Illinois law requires only that parental discipline be reasonable, not necessary. Instead, we believe that the "necessary" element is often inherently implicated and analyzed when reviewing the "reasonableness" of parental discipline. For example, in *Parrott*, we explained that when

> "considering whether an act of corporal punishment was reasonable, it is appropriate for the court to consider (1) the degree of physical injury inflicted upon the child, (2) the likelihood of future punishment that may be more injurious, (3) the fact that any injury resulted from the discipline, (4) the psychological effects on the child, and (5) 'the circumstances surrounding the "discipline," including whether the parent was calmly attempting to discipline the child or whether the parent was lashing out in anger.' " *Parrott*, 2017 IL App (3d) 150545, ¶ 25 (quoting *F.W.*, 261 Ill. App. 3d at 903).

The above factors clearly implicate a consideration of the necessity of the discipline. In *Parrott*, we specifically noted that the child was hit "six or seven times" "with a belt for the trivial transgression of eating a biscuit." *Id.* ¶ 27. The use of force in *Parrott* was neither reasonable nor necessary.

¶ 14    Defendant next contends that the jury instructions were conflicting. The instructions read in relevant part:

---

[1] To succeed on a claim of ineffective assistance of counsel, defendant has to show that (1) counsel's performance was deficient and (2) the deficient performance resulted in prejudice to defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

(1) "To sustain the charge of Aggravated Battery," the State had to prove, *inter alia*, "[t]hat the force used was not reasonable or necessary,"

(2) "To sustain the charge of Domestic Battery," the State had to prove, *inter alia*, "[t]hat the force was not reasonable or necessary," and

(3) "A parent or a person lawfully acting in a parent's place is justified in using corporal punishment as discipline so long as it is necessary and reasonable."

Defendant argues the above instructions are in conflict since the first two instructions state "reasonable *or* necessary" and the third instruction states "reasonable *and* necessary." We disagree. The first two instructions involve the State's burden of proof. The third instruction, however, was an individual instruction discussing defendant's affirmative defense to use corporal punishment as discipline. Defendant does not dispute that he used force when disciplining A.C.M. As discussed above (*supra* ¶¶ 12-13), and as explained through the third instruction, defendant's discipline of A.C.M. was justified only if it was both necessary and reasonable. In other words, because such discipline is only legally allowable if it is both necessary and reasonable, the State merely needed to prove that defendant's conduct did not satisfy one of these prongs. The first and second instructions correctly codify and explain this burden of proof. The instructions are not in conflict.

¶ 15 Since we find that the instructions did not misstate the law and were not conflicting, trial counsel was not deficient for failing to object. Moreover, there is no plain error. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (the first step in the plain error analysis is determining whether error occurred).

¶ 16 CONCLUSION

¶ 17 The judgment of the circuit court of Peoria County is affirmed.

¶ 18 Affirmed.